**In re ADVISORY OPINION (CHIEF JUSTICE).**

No. 85–471–M.P.

Supreme Court of Rhode Island.

April 4, 1986.

Robert G. Flanders, Edwards & Angell, for Gov. Edward D. DiPrete.

Arlene Violet, Atty. Gen., Shiela Tobie Swan, Sp. Asst. Atty. Gen., Stephen J. Fortunato, McKinnon & Fortunato, for Grand Lodge R.I. Order Sons of Italy.

Richard M. Egbert, for Chief Justice Joseph A. Bevilacqua.

Michael P. DeFanti, Hinckley Allen Tobin & Silverstein, for R.I. Bar Ass'n.

Patricia A. Hurst, D'Amico Connor & Hurst, amicus curiae.

John A. MacFadyen, II, for American Civil Liberties Union.

In re Request for Advisory Opinion to the Governor and the Leaders of the House of Representatives and the Senate.

His Excellency, Edward D. DiPrete, Governor the State of Rhode Island, The Honorable Matthew J. Smith, Speaker of the Rhode Island House of Representatives, and the Honorable John C. Revens, Jr., Majority Leader of the Rhode Island Senate:

We have received your request seeking the advice of the justices of this court in accordance with the provisions of section 2 of article XI of the amendments to the Rhode Island Constitution. The question posited is as follows:

"May a joint resolution such as 85–S16 entitled, "Joint Resolution Vacating the Judgeship of Chief Judge (sic) Joseph A. Bevilacqua," be acted upon if the 1985 General Assembly session is reconvened pursuant to Joint Resolution No. 85–S1064 in light of Section 4 of article X requiring that "such Resolution shall not be entertained at any other than the annual session for the election of public officers * * *?""

Before engaging in a discussion of this question, a review of the matters which occurred prior to your request is in order.

On January 1, 1985 Senator Robert T. Motherway introduced a resolution entitled, "Joint Resolution Vacating the Judgeship of Chief Justice Joseph A. Bevilacqua." The resolution declares the office of Chief Justice Bevilacqua vacant. The Senate referred the resolution to the Senate Committee on Special Legislation.

Following the 1984 general elections in the State of Rhode Island, the newly elected Attorney General wrote to the chairman of the Rhode Island Commission on Judicial Tenure and Discipline requesting an investigation by the Commission into the conduct of Chief Justice Joseph A. Bevilacqua.

The Rhode Island Commission on Judicial Tenure and Discipline investigated and held hearings which resulted, on June 20, 1985, in the following disposition which was agreed to by Chief Justice Bevilacqua:

"1. The Commission and the respondent agreed that Chief Justice Joseph A. Bevilacqua, Sr., has engaged in conduct that violates Canons 4 and 29 of the Canons of Judicial Ethics and that such conduct has brought his judicial office into seri-

ous disrepute. He is hereby PUBLICLY CENSURED for those violations.

"2. Chief Justice Bevilacqua acknowledges that it is essential for a judge to avoid the appearance of impropriety and to adhere strictly and scrupulously to the Canons of Judicial Ethics.

"3. After extensive investigation, including a review of the opinions of the Rhode Island Supreme Court during the tenure of Chief Justice Bevilacqua, the Commission has found no evidence, and has no reason to believe, that the conduct referred to in paragraph 1 has in any way affected any of his judicial decisions.

"4. The Commission and the respondent agree that Chief Justice Bevilacqua will abstain from performing the official duties of his office for a period of four (4) months, beginning on July 1, 1985 and ending on October 31, 1985.

"5. Chief Justice Bevilacqua agrees that he will forego all compensation during the four-month period referred to in paragraph 4 and will execute any and all documents necessary to effectuate this intent * * * "

"6. Chief Justice Bevilacqua acknowledges and accepts the authority of the Commission with respect to all proceedings herein and waives any challenge thereto.

"7. On execution of this Order of PUBLIC CENSURE, the proceedings herein are terminated.

"8. This Order is entered by the unanimous vote of the thirteen (13) Commissioners in attendance and with the approval of the Commission's Special Counsel, Arthur J. Goldberg."

Subsequently, on June 21, 1985, the 1985 session of the General Assembly adjourned

without the Senate Committee on Special Legislation acting on Resolution 85–S116. The Joint Resolution of Adjournment, No. 85–S1064, provided that each House of the General Assembly may be reconvened by the respective legislative leaders upon three days notice to continue the 1985 session.

On October 11, 1985, this court received the aforementioned request for an advisory opinion. On November 25, 1985, we responded to said request by stating that the question should be answered in the negative. This opinion sets forth the basis for our response, including a discussion of the propriety of the request.

I.

## THE PROPRIETY OF THE REQUEST

■ Although the petitioners' request involves a matter of the utmost importance, there are some preliminary procedural issues which we desire to put in context before we address the merits of this inquiry.[1]

■ One procedural deficiency arising from this particular request is that the petition was jointly made by the leaders of each House and the Governor. This court will not render an advisory opinion except upon the written request of the Governor *or* (not and) of either House of the General Assembly. *Industrial National Bank of Rhode Island v. Isele,* 101 R.I. 734, 737, 227 A.2d 203, 206 (1967). We are constitutionally obligated to give advisory opinions to either House of the General Assembly only when the questions propounded concern the constitutionality of pending legislation, and to the Governor only when the

---

1. In *Advisory Opinion to the House of Representatives,* 108 R.I. 151, 272 A.2d 925 (1971), this court declined to give an advisory opinion in a situation in which the House of Representatives had adjourned *sine die* without waiting to receive the opinion, thereby rendering the question moot. According to the Joint Resolution of Adjournment in the present matter, 85–S1064, the members of each adjourned House were subject to recall by their respective legislative

heads, the Speaker of the House of Representatives and the Majority Leader of the Senate, upon three days notice. As a result, this joint resolution of adjournment adopted June 21, 1985 was not an adjournment *sine die.* Consequently, we do not consider the question propounded before us to be moot. *In re Advisory Opinion to the House of Representatives,* 485 A.2d 550, 551 n. 1 (R.I.1984).

questions propounded concern the constitutionality of existing statutes which require implementation by the Chief Executive. However, neither of those coordinate authorities have standing to propound questions which are clearly the prerogative of the other. *Opinion to the House of Representatives,* 433 A.2d 944 (R.I.1981). Irrespective of whether the legislative or executive branch is properly before us, the joint nature of the request would be inappropriate for review by this court. Moreover, even if this court were to view these requests to be bifurcated, each request as propounded is improper and procedurally deficient.

■ Referring specifically to the request by the Speaker and the Senate Majority Leader, the following language from the *Reply of The Supreme Court To A Communication From Certain Members of The House of Representatives in The General Assembly,* 58 R.I. 51, 54, 191 A. 259, 271 (1937) is instructive:

"We are not unmindful of the generally accepted principle of the law of legislative assemblies that the house means a majority of the house. That principle is also the constitutional law of this state. (art. IV, sec. 6). Generally, no business of any kind can legally be performed by any number less than a majority, except to adjourn or compel the attendance of absent members. In other words, majority rule is firmly imbedded in our fundamental law and governs the house of representatives."

The court in that case declined to render an advisory opinion because the petition only constituted an attempt by some members of the house of representatives to secure the court's advice, and not a formal and collective action by the house as required by article XII, section 2 of the Rhode Island Constitution. Similarly in the case at bar, the request by the petitioners was brought before this court by only the leaders of each house and the governor. No formal action was taken in a collective fashion by either branch of the General Assembly in petitioning the court on this matter. Hence, the request from the House Speaker and the Senate Majority Leader fails to meet the standards enunciated.

■ As far as the Governor's request is concerned, there are a few principles regarding the rendering of advisory opinions which should be articulated. First, a question or questions propounded to the Supreme Court must have some relationship to the official duties of the coordinate branch propounding the questions. *Opinion to the Governor,* 109 R.I. 289, 284 A.2d 295 (1971). Second, this court should avoid giving advisory opinions in circumstances not constitutionally mandated; thus, giving such opinions in matters unconnected with the official function of the requesting coordinate branch would be gratuitous. *Id.* Third, we only advise the chief executive in those instances in which the questions propounded have a bearing upon a present constitutional duty awaiting performance by the Governor. *In re Request for Advisory Opinion,* 472 A.2d 301, 302 (R.I.1984). In light of these legal precepts and a review of the request before us, it is clearly evident that the Governor has no present constitutional duty awaiting performance in these circumstances. Furthermore, since according to article X, section 4 of the Rhode Island Constitution, the Governor plays no role in the removal of a supreme court justice, his request does not comport with the law.

■ In spite of the procedural deficiencies inherent within the petition before us, and in view of the fact that either branch of the Legislature could independently, by majority vote, propound the same question to this court, we shall exercise our discretion and waive the defects so that we can address the profoundly important substantive issues raised by the petitioners' request. We must reiterate that we shall not consider this action as a precedent indicating that in the future we shall render an advisory opinion when the requesting petition is improperly before this court or pro-

cedurally defective. Our decision, however, to go forward with a judicial review of this matter is solely attributable to the constitutional and public importance of the question propounded to this court.

## II

WHETHER THE GENERAL ASSEMBLY HAS THE POWER TO REMOVE A JUSTICE OF THE SUPREME COURT BY A JOINT RESOLUTION DECLARING THE OFFICE VACANT, IN THE LIGHT OF THE PROVISIONS OF ARTICLE X, SECTION 4 OF THE RHODE ISLAND CONSTITUTION WHICH STATES THAT "SUCH RESOLUTION SHALL NOT BE ENTERTAINED AT ANY OTHER THAN THE ANNUAL SESSION FOR THE ELECTION OF PUBLIC OFFICERS."

 For reasons fully set forth below, we are of the opinion that article X, section 4 expressly limits the legislature's power to remove a justice of the Supreme Court to that day upon which "the annual session for the election of public officers" took place. As the result of constitutional amendments, that session has been eradicated and because of its demise the power to remove has been extinguished.

On the matter of constitutional interpretation, the United States Supreme Court said in *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 723, 9 L.Ed. 1233 (1838) that "[i]n the construction of the constitution, we must look to the history of the times, and examine the state of things existing when it was framed and adopted * * *." Therefore, an exposition of the changes in the structure of government in Rhode Island as it had evolved from the early years of the colony to the middle 1800s is

helpful in appreciating the political climate in which article 10, section 4 was adopted into the 1842 Constitution.

Rhode Island, unlike most of its neighbors, was not founded as a controlled experiment under the authority of the King of England or his deputies.[2] It was founded without official sanction by different groups of people who came from other colonies for reasons personal to them. They all purchased the land from the Indians who were living here rather than obtaining it by a grant from the King.

These different groups were made up of people who were quite average except for the fact that they were out of step with the prevailing rigid religious attitudes of the settlements that they had left voluntarily or from which they were expelled. They were Baptists, Antinomians,[3] Arminians,[4] Quakers, Catholics and Jews and all of them were highly individualistic and independent.

These groups established towns in Providence, Portsmouth, Newport and Warwick, and in the beginning, no statewide organization or colonial government existed. The first General Assembly was simply a gathering of men who were eligible to vote in the towns from which they came. It was the towns who called the central state government into being and the early acts of the general assembly had to be sent back to the different cities and towns for approval.

In 1663, the Charter of Charles II validated Rhode Island's right to exist. By that date, the people were electing a Governor and a Deputy Governor and ten assistants at large. Each of the towns also

**2.** We are indebted to the Rhode Island Historical Society and the research and scholarship of its director Albert T. Klyberg for the very informative article by Mr. Klyberg, "A Heritage of Independence and Accessibility."

**3.** Antinomianism—"[T]he theological doctrine that by faith and God's gift of grace through the gospel a Christian is freed not only from the Old Testament law of Moses and all forms of legalism but also from all law including the general-

ly accepted standards of morality prevailing in any given culture." Webster's Third New International Dictionary 95 (1967).

**4.** Arminianism—"[T]he doctrines or teachings of Arminius [a Dutch theologian] who opposed the absolute predestination taught by Calvin and who maintained the real possibility of salvation for all." Webster's Third New International Dictionary 119 (1967).

elected deputies or representatives. The right to vote was easily obtained by owning a small amount of property. Colony wide elections took place in the Spring and Fall. The Governor, Deputy Governor and assistants stood for election in May and the deputies were elected in October. The voting took place in the town meetings and ballots were signed before the magistrates. Ballots or proxies were taken to Newport for the official tally. By the end of the 1600's, most of the other General Offices of the state had been created, the Secretary of State, the Attorney General and the General Treasurer.

By 1700 or shortly before, the ten assistants at large had evolved into an upper house that later became the Senate and the deputies from the towns had become a lower house that became the House of Representatives. The Governor and Deputy Governor were members of the upper house and had very little executive authority. Their offices were primarily ceremonial. The two houses sitting together in "Grand Committee" made all of the appointments to office and distributed patronage.

Frequency of election, limited executive powers, the legislative appointment of the judiciary were salient elements of the charter government. Freedom of religion, press, assembly and petition were a part of the Rhode Island tradition for nearly a century before they were written into the United States Constitution. Government was kept small in size and close to the people. This was fostered by having the legislative sessions move around the state. Until the middle of the 1800's, the legislators met at Newport, Bristol, Providence, East Greenwich and Kingston. From about 1850 to 1893, state government alternated between Newport and Providence. From 1893 on, legislative sessions were held in Providence only.

Our constitutional development involving the structure and operations of state government reflected this evolution. In particular, the constitutional framework establishing the timing and location of General Assembly sessions and the method by which public officers would be elected has been the subject of substantial amendment. These amendments are at the heart of the issue before us today.

Article IV, sec. 3 of the original constitution that was adopted in 1842 and became effective in 1843 provided that:

"There shall be two sessions of the general assembly holden annually: one at Newport, on the first Tuesday of May, for the purposes of election and other business; the other on the last Monday of October, which last session shall be holden at South Kingstown once in two years, and the intermediate years alternately at Bristol and East Greenwich; and an adjournment from the October session shall be holden annually at Providence."

The election referred to in art. IV, sec. 3 was the annual session for the election of public officers. At that time, all general officers and all Rhode Island Senators and Representatives stood for popular election annually on the first Wednesday in April under the provisions of article VIII, section 1. Under article VIII, sections 7 and 10, any person who sought election to one of these offices was required to obtain a majority of the votes. If no person received a majority of the votes cast for a particular office, the Legislature, sitting in grand committee, would select one of the two top vote getters to fill that office. Because the terms of office began on the first Tuesday in May as provided in art. VIII, sec. 1, it was only logical that a vacancy in office created by the failure of any candidate to obtain a majority of the votes would be dealt with on the same day by the grand committee at the May session convened "for the purpose of election and other business", as prescribed by art. IV, sec. 3. This is because that particular session also began on the first Tuesday in May, pursuant to art. IV, sec. 3.

Eleven years later, in 1854, art. IV, sec. 3 of the original constitution was supersed-

ed by article III of the amendments. It provided:

"There shall be one session of the General Assembly, holden annually, commencing on the last Tuesday in May, at Newport, and an adjournment from the same shall be holden annually at Providence."

This article remained in effect until 1893 when article III of amendments was in turn superseded by article XI of the amendments. The new amendment contained several provisions regarding election and terms of office and it provided for one session of the General Assembly to be held in Providence, commencing on the first Tuesday in January of each year. The most important aspect of this constitutional evolution, for our purposes, was the enactment in 1893 of article X of the amendments which provides that all elections in the state should be by plurality not majority. This amendment divested the General Assembly of its former constitutional duty to hold elections in grand committee for the purpose of choosing between the two highest vote getters in an election in which neither had been able to capture the office by a majority of the votes.

In 1900, article XI, sec. 2 of the amendments changed the time on which the general election would be held but not the one year term of office. It provided for annual elections to be held on the Tuesday next after the first Monday in November. Finally, in 1912, article XVI, sec. 1 of the amendments, provided that, beginning with 1912, elections would be held biennially.

In approaching the issue before us today, we believe that "the safest rule of interpretation, after all, will be found to be to look to the nature and objects of the particular powers, duties and rights, with all the lights and aids of contemporary history; and to give to the words of each just such operation and force, consistent with their legitimate meaning, as may fairly secure and attain the ends proposed." *Prigg v. Pennsylvania*, 41 U.S. (16 Pet.) 536, 609, 10 L.Ed. 1060 (1842). Having followed this guidance given us by the United States Supreme Court, we conclude that the adoption of biennial elections, coupled with the change to plurality elections, consigned to history the "annual session for the election of public officers." Because this session no longer takes place, we do not believe that the Legislature today retains the removal power contained in article X, section 4, of the Constitution. That section provides:

"Election and removal of supreme court judges * * * Impeachment. The judges of the supreme court shall be elected by the two houses in grand committee. Each judge shall hold his office until his place be declared vacant by a resolution of the general assembly to that effect; which resolution shall be voted for by a majority of all the members elected to the house in which it may originate, and be concurred in by the same majority of the other house. *Such resolution shall not be entertained at any other than the annual session for the election of public officers; and in default of the passage thereof at said session, the judge shall hold his place as is herein provided.* But a judge of any court shall be removed from office if, upon impeachment, he shall be found guilty of any official misdemeanor." (Emphasis added).

When we interpret the constitution, we are guided by the same rules of construction that apply to the construction of statutes. *City of Jacksonville v. Continental Can Co.*, 113 Fla. 168, 151 So. 488 (1933). *See also Opinion to the Governor*, 44 R.I. 275, 117 A. 97 (1922). The general rule is that where a statute specifies the time within which a public officer is to perform an official act regarding the rights and duties of others, it will be considered as directory merely, unless the nature of the act to be performed, or the language used by the legislature, show that the designation of time was intended as a limitation of the power of the officer. *In re the Census Superintendent*, 15 R.I. 614, 616, 15 A.

205, 205 (1885) (citing *People v. Allen,* 6 Wendell 486 (1831)).

The language of art. X, sec. 4 expressly limits the removal power. In *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), Chief Justice Marshall stated that "[i]t cannot be presumed, that any clause in the constitution is intended to be without effect; and therefore, such a construction is inadmissible, unless the words require it." *Id.* at 174, 2 L.Ed. at 72. We believe those words are appropriate to the situation at hand. In article X, section 4, the authors of the constitution made it absolutely clear that the Legislature could not consider the joint resolution for removal of a Supreme Court Justice "at any time other than the annual session for the election of public officers." Their choice of the words "shall not be entertained," coupled with the fact that no such limitation was placed on the legislature's power to impeach, in our opinion, renders this conclusion inescapable. Moreover, "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary sense as distinguished from technical meaning; where the intention is clear there is no room for construction and no excuse for interpolation or addition." *United States v. Sprague,* 282 U.S. 716, 731, 51 S.Ct. 220, 222, 75 L.Ed. 640, 644 (1931). *See also The Pocket Veto Case,* 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929); *Edwards v. Cuba R. R. Co.,* 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124 (1925); *Hodges v. United States,* 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65 (1906); *Lake County v. Rollins,* 130 U.S. 662, 9 S.Ct. 651, 32 L.Ed. 1060 (1889); *Tennessee v. Whitworth,* 117 U.S. 139, 6 S.Ct. 649, 29 L.Ed. 833 (1885); *Craig v. Missouri,* 29 U.S. (4 Pet.) 410, 9 L.Ed. 903 (1830); *Brown v. Maryland,* 25 U.S. (12 Wheat.) 419, 6 L.Ed. 678 (1827); *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816); Story, *Commentaries on the Constitution* § 451 (5th ed. 1891); *Cooley's Constitutional Limitations,* 61, 70 (2nd ed.).

While one might argue that the inadvertent repeal of a power is not lightly to be assumed, in this instance, between 1843 when the Constitution became effective and 1893, when the need for the elective function of the General Assembly was finally ended by article XI of the amendments, it is significant that half a century had passed without the removal of a single justice. Without question, those who adopted the amendment were eliminating the occasion for the exercise of a power that had fallen into complete disuse.

We are not unmindful of the fact that, in 1935, the Legislature momentarily attempted to resurrect the power to vacate and it arbitrarily selected the first day of the legislative session as appropriate for its exercise. Because the justices who were purportedly removed resigned their offices and accepted pensions that were paid to them for life, that action was never challenged and the question of whether the Legislature had the removal power after 1893 was never adjudicated in any forum. Consequently, that event does not serve as a persuasive precedent either historically or legally.

The language of article X, section 4 makes the time for the exercise of the power of removal vital to the power itself. With the elimination of the time and the occasion for the exercise of the power, it ceased to exist.

We believe that the logical interrelationship of the amendments in our Constitution's evolution compels only one conclusion. The power of the Legislature to remove Supreme Court justices by joint resolution was limited from the very beginning, conditioned specifically on the occurrence of a legislative session that met annually for the election of public officers. With the effective abolition of that session in 1854, and more certainly in 1893, there was and is no longer any constitutionally ordained forum in which this power can be exercised.

## III

IN THE LIGHT OF THE CIRCUMSTANC-ES OF ITS INTRODUCTION, IS JOINT RESOLUTION 85–S16, WHICH PUR-PORTS TO VACATE THE POSITION OF CHIEF JUSTICE JOSEPH A. BEVILAC-QUA, VIOLATIVE OF THE PROHIBI-TION, CONTAINED IN ARTICLE I, SEC-TION 10 OF THE CONSTITUTION OF THE UNITED STATES, AGAINST THE PASSAGE BY ANY STATE OF A BILL OF ATTAINDER?

The court must take judicial notice of the well-known fact that at the time of the introduction of Joint Resolution 85–S16, entitled "Joint Resolution Vacating the Judgeship of Chief Judge [sic] Joseph A. Bevilacqua," accusations of misconduct had been leveled against the Chief Justice because of his alleged association with persons of criminal background. These accusations resulted in consideration of possible disciplinary action against the Chief Justice by the Commission on Judicial Tenure and Discipline of this state. For purposes of this opinion, it is not necessary to consider the details of the hearings and consideration by the Commission on Judicial Tenure and Discipline since we have already noted that a resolution of the issues before the commission was reached by agreement of the commission and the Chief Justice upon recommendation of its counsel, former United States Supreme Court Justice Arthur Goldberg, and counsel for the Chief Justice as set forth in the first portion of this opinion. Under this agreement, the Chief Justice removed himself from office for a period of four months without pay. That abstention from judicial duties terminated November 1, 1985.

Although the joint resolution does not specify the reason for removal of the Chief Justice, it is clear beyond doubt that the basis for the resolution was a response to the charges of misconduct that were also considered by the commission.

Article I, section 9 of the Constitution of the United States denies to Congress the power to pass a bill of attainder or ex post facto law. Article I, section 10 of the Constitution places the same prohibition upon the states. The bill of attainder was well known to the framers of the Constitution of the United States and the prohibition thereof was designed to prevent the abuses of the legislative power that had frequently taken place over the centuries in England. As it was known and implemented during the 16th, 17th and 18th centuries, the bill of attainder was directed to persons who were believed by members of Parliament to have sought to overthrow the royal government or to have given aid or assistance to those who were so engaged. *See, e.g.*, 3 Jac. I, c. 2; 10 & 11 Will. 3, c. 13; 13 Will. 3, c. 3; 9 Geo. 1, c. 15. Normally, the bill of attainder by Parliamentary act sentenced to death one or more specific persons or those who could be determined by description to have participated in the insurrection. Coupled with the death sentence, the bill of attainder would normally impose "corruption of blood." This meant that the attainted party's heirs could not inherit his property. *United States. v. Brown*, 381 U.S. 437, 441, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484, 487–88 (1965); 3 Coke, 1st Inst. (on Littleton) 565 (Thomas ed. 1818). As a corollary to the bill of attainder, Parliament had the power to enact and did enact a "Bill of Pains and Penalties." Such a bill was identical to the bill of attainder except that it provided a penalty less than death. Such a penalty might include banishment, deprivation of the right to vote, or exclusion of the designated person's sons from membership in Parliament. *Brown*, 381 U.S. at 441–42, 85 S.Ct. at 1711, 14 L.Ed.2d at 488. Bills of attainder and pains and penalties were not limited to English practice but were extensively utilized during the American Revolution when all thirteen newly independent states enacted statutes directed against those that were were loyal to the British Crown. *Id.*

The bill of attainder clause was designed by the framers to insure that the Legislature did not overstep its bounds in imposing punishment upon individuals without

hearing or trial. Alexander Hamilton observed:

"Nothing is more common than for a free people, in times of heat and violence, to gratify momentary passions, by letting into the government principles and precedents which afterwards prove fatal to themselves. Of this kind is the doctrine of disqualification, disenfranchisement, and banishments by act of the legislature." *The Federalist*, No. 48, 383–84 (Hamilton ed. 1880).

It was a frequently expressed opinion, during the period succeeding the adoption of the Constitution, that the Legislature was not suited by its numbers and organization to try with coolness, caution and impartiality a criminal charge, especially in those cases in which popular feeling was strongly excited. *See* 1 Cooley, *Constitutional Limitations*, 536–37 (8th ed.1927). As early as the decision in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136, 3 L.Ed. 162, 178 (1810), it was stated in dictum that it was "the peculiar province of the legislature, to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments."

Following the Civil War, the Supreme Court of the United States considered two cases: *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1867), and *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867). In *Cummings*, the Court determined that a provision of the Missouri constitution which deprived a Catholic priest of his right to administer the sacraments of his church and to serve as a minister of his faith, without taking an oath that he had never engaged in acts constituting loyalty to the Confederacy, was a violation of the attainder clause. In *Garland*, the Court, for similar reasons, voided a requirement by the Congress that a person could not practice law without subscribing to a loyalty oath of equivalent import. In both cases the Court determined that the attainder clause was applicable to bills of pains and penalties as well

as to the traditional death penalty of a bill of attainder. *Garland*, 71 U.S. (4 Wall.) at 377, 18 L.Ed. at 369–70; *Cummings*, 71 U.S. (4 Wall.) at 323, 18 L.Ed. at 363. In summary, the Court observed in *Cummings*:

"The Constitution deals with substance, not shadows. Its inhibition was levelled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding. 71 U.S. (4 Wall.) at 325, 18 L.Ed. at 363.

Eighty years later, the Supreme Court again considered the attainder clause in *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). In that case Congress had passed, after some resistance by the Senate, an appropriation bill cutting off the salaries of three named individuals, Lovett, Watson and Dodd, who were suspected by investigators of the Dies Committee of subversive activities and of association with "communist front organizations." In striking down this act as violative of the Bill of Attainder clause, the Court reiterated the holding in *Cummings v. Missouri, supra,* that a bill of attainder is a legislative act that inflicts punishment without a judicial trial and that the bill of attainder includes a bill of pains and penalties. The Court went on to determine that the prohibition by Congressional act of federal employment by three named individuals with the concomitant stigma upon their reputations fell precisely within the bill of attainder prohibition. Justice Black, speaking for the Court, suggested:

"Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons because the legislature thinks them guilty of conduct which deserves punishment. They intended to safeguard the people of this country from punish-

ment without trial by duly constituted courts." *United States v. Lovett*, 328 U.S. at 317, 66 S.Ct. at 1079–80, 90 L.Ed. at 1260.

Finally, in *United States v. Brown, supra*, Chief Justice Warren, quoting *Lovett*, 328 U.S. at 315–16, 66 S.Ct. at 1079, 90 L.Ed. at 1259 with approval, reiterated that "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States v. Brown*, 381 U.S. at 448–49, 85 S.Ct. at 1715, 14 L.Ed.2d at 492.

In *Brown*, the Court struck down a statute that made it a criminal offense for a person who had been a member of the Communist party to serve as an officer or (except in clerical or custodial positions) as an employee of a labor union. Although the persons were not specified by name, the Court held that the infliction of a deprivation upon one described as a member in the Communist party as opposed to specifically named individuals did not preclude its violation of the attainder clause. The Court stated that under our Constitution Congress possesses full legislative authority, but the task of adjudication must be left to other tribunals.

For bill of attainder purposes, a justice of the Supreme Court would have a fully protectible interest in his employment and the ancillary benefits incident thereto. When one considers that for a period of one hundred forty-four years a justice of the Supreme Court had a fully justified expectation of employment until retirement, resignation or death, with only one exception in 1935 (in which full retirement benefits were accorded the justices), it seems clear beyond doubt that a property interest has been established even for purposes of due process. *See Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92

S.Ct. 2701, 33 L.Ed.2d 548 (1972); VanAlstyne, *The Demise of the Right-Privilege Distinction in Constitutional Law*, 81 Harv.L.Rev. 1439, 1457 (1968); Reich, *The New Property*, 73 Yale L.J. 733 (1964). Even such a case as *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), does not deprive a government employee of due process, but only allows the government agency to determine what process is due for purposes of a pre-termination or post-termination hearing. *Arnett* does not suggest that removal without any hearing at all would meet the requirements of due process. In any event, the analysis in the instant case is properly a bill of attainder rather than a due process question. We are of the opinion that the removal of a Supreme Court justice for misconduct, without an opportunity to be heard, by a majority of both Houses of the Legislature would not meet either safeguard.

It must be noted that in responding to the instant request for advisory opinion, we deal with a provision of the Constitution of the State of Rhode Island as the Supreme Court of the United States in *Cummings v. Missouri* dealt with a provision of the Missouri Constitution. When the Constitution of Rhode Island was first adopted in 1842, *Cummings v. Missouri, supra*, and later cases expounding upon the attainder clause by the United States Supreme Court, had not yet been decided. Moreover, as indicated in earlier portions of our response to the request for advisory opinion, the purpose of article X, section 4, of the Constitution of Rhode Island, dealing with election and removal of the judges of the Supreme Court, did not, at least facially, relate necessarily to punitive actions by the Legislature in respect to the removal of a justice. Prior to the adoption of the Constitution of 1842, Supreme Court justices were elected annually. This provision was designed to increase the tenure of such judges to an indefinite term which might terminate by death, resignation, or removal, as well as by impeachment. *Opinion to the Governor, Re The Election of Justices of the*

*Supreme Court,* 23 R.I. 635, 51 A. 221 (1902). The framers of the Rhode Island Constitution and the justices who rendered the advisory opinion in 1902 did not consider whether this provision relating to election and removal of judges would be subject to the limitations of the attainder clause of the Federal Constitution.

It is, of course, theoretically possible that a judge might have been removed from office without any suggestion of misconduct or stigma upon his reputation. Such a question, however, cannot be considered in a vacuum in light of the fact that no justice of the Supreme Court was removed from office from the adoption of our Constitution in 1842 until the attempted removal of all five justices in 1935 as a result of real or fancied shortcomings on the part of such justices. It is also a matter of historical fact that the removal of the justices in 1935 was not challenged because all of the justices voluntarily resigned when offered paid retirement for the rest of their lives.

Consequently, we are faced with a situation in which the provision allowing removal of justices has not been implemented in the face of a challenge for a period of one hundred forty-four years. As with removal by address in Connecticut, Maine and Massachusetts, the remedy is seldom exercised.[5]

It is not surprising that the framers of the Rhode Island Constitution were not particularly sensitive to the limitations of the Federal Constitution since in 1842 those limits were scarcely perceptible. The Bill of Rights at that time was a limitation solely upon federal as opposed to state power. *See Barron v. Mayor and City Council of Baltimore,* 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833). This doctrine was to be unchanged for many years. *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); *Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937); *Twining v. New Jersey,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908); *Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873). Although the bill of attainder clause was a direct limitation upon state power, *Cummings v. Missouri, supra,* and *In re Garland, supra,* were not decided until twenty-five years after the Rhode Island Constitution was adopted.

■ In any event, the limitation of the attainder clause would, in our judgment, completely preclude the passage of any resolution purporting to remove the Chief Justice or any justice of this court in a context in which such removal would be construed as punishment for past misconduct by implementation of the provisions contained in article X, section 4, which provides for a majority vote of both Houses of the General Assembly.

■ However, this opinion should in no way be construed as indicating that the attainder clause would inhibit application of the provisions of article X, section 4, which states:

"But a judge of any court shall be removed from office if, upon impeachment, he shall be found guilty of any official misdemeanor."

The latter provision refers to article XI of the Constitution which deals with impeachments. Such article provides in section 1 for impeachment by the House by a vote of two-thirds of all the members and for a trial of such impeachment by the Senate. The process of impeachment would in our opinion not transgress the bill of attainder clause because it gives to the party accused an opportunity to be heard and to present evidence in his own defense. In short, the impeachment proceeding allows for due process to be afforded to the accused. On the contrary, a justice who is removed by a majority vote of both houses of the General Assembly is not entitled to a hearing or to any of the procedural safeguards normally accorded to an accused person under the

---

**5.** For an interesting evaluation of the Massachusetts Bill of Address, its history, application and possible conflict with the Bill of Attainder provisions, *see* Note, 13 *Suffolk* U.L.Rev. 1319 (1979). *See also Matter of Robert M. Bonin,* 375 Mass. 680, 378 N.E.2d 669 (1978).

judicial process. Impeachment is the sole method which may be utilized for the removal of a justice of the Supreme Court that would comport with the limitations of the bill of attainder clause.

We express no opinion on whether other methods of removal might be devised that would include a judicial hearing prior to such removal together with subsequent action by the Legislature. No such provision presently exists in the Rhode Island Constitution in respect to the justices of the Supreme Court, although such action may take place in respect to other judicial officers pursuant to the Judicial Tenure and Discipline Act, G.L.1956 (1985 Reenactment) chapter 16 of title 8.

For the reasons stated, we answer the question addressed to us by the Governor and the leaders of the Rhode Island House of Representatives and Senate in the negative.

Respectfully submitted,

Joseph R. Weisberger

Florence K. Murray

Donald F. Shea

KELLEHER, Justice, dissenting.

I share my colleagues' concern at the propriety of responding to the inquiry now before us. However, recently in *In re Advisory Opinion to the Governor Regarding Conflict of Interest*, 504 A.2d 456 (R.I. 1986), all four justices recognized that there could be instances in which the public interest would mandate a response to an inquiry even though the inquiry failed to satisfy the criteria usually employed in determining whether or not a response was required. Here the public interest in the General Assembly's ability or inability to remove a justice of this court from office by the passage of a resolution declaring the particular office vacant mandates a definitive response.

I reluctantly disagree with my colleagues' implied repeal of a provision that

has been part of the state's Constitution since it was adopted in 1842 and their reliance on the constitutional bar against legislative enactment of bills of attainder.

In determining whether the General Assembly continues to retain the power to remove the members of the Supreme Court from office by the passage of a resolution declaring a particular position or positions to be vacant, consideration of the long-standing historical relationship that has existed between the Legislature and this court is most appropriate.[6] I begin by returning to the time of Roger Williams, who had traveled to England and on March 14, 1643, received from Oliver Cromwell and other members of Parliament a Parliamentary Patent which gave the inhabitants of Providence, Portsmouth, Newport, and later Warwick a "free and absolute Charter of Civil Incorporation to be known by the name of Incorporation of Providence Plantations, in the Narragansett Bay in New-England."*a*

For reasons not readily apparent, the charter remained dormant until May of 1647. On the nineteenth, twentieth, and twenty-first of that month, a major part of the colony assembled in Portsmouth, where at a "General Court of Election" the charter was adopted and implementing legislation was enacted.*b* A General Court of Trials was established for the whole colony. The officers were to consist of one president, four assistants—"one for every town"—a recorder, a treasurer, and a sergeant. All officers were chosen annually by the freemen "in the grand committee and towards the latter end of that session." *c* The court met twice a year, with the president as chief judge and the four assistants acting as associate justices, unless they were "necessarily" detained by other matters.*d* The charter also authorized the adoption of legislation relating to the replacement of a judicial officer who "goes without, beside, or beyond his commission."

**6.** For ease of reading, the sources which serve as the basis for the historical review will be set

forth in an appendix attached to this opinion.

*e* The General Assembly was a court of last resort for those who were dissatisfied with the actions of the trial court, and relief might be obtained by petitioning the Assembly.*f*

It is obvious that those gathered at the first meeting of the General Assembly limited their deliberations to the formation of a judiciary. William R. Staples, who served as Chief Justice of this court from 1856 to 1866, in commenting on the 1647 legislation, observed: "It would seem that neither the president nor the assistants, in virtue of their offices, had any share in legislation. That power remained entire in the hands of the General Assembly of the whole people * * *."*g*

Once the monarchy emerged triumphant from its struggle with Cromwell and his cohorts, the colonists thought the time was opportune for requesting a Royal Charter. In early July 1663, Charles II forwarded to "The English Colony of Rhode Island and ProvidencePlantations in New England in America" a document that has been described as the "Munificent Charter,"*h* one that bestowed a generous amount of autonomy on a colony that had not yet reached the age of twenty-one. The charter also called for the annual election from among the freemen of a governor, deputy governor, and ten assistants.*i* The annual election was to be held in Newport.*j* The General Assembly was authorized and directed to establish courts of jurisdiction for the hearing of civil matters and the imposition of criminal sanctions such as fines, imprisonments, and "other punishments, pecuniary and corporal" and again to "alter, revoke, annul, or pardon such fines, * * * imprisonments, sentences, judgments and condemnations as shall be thought fit * * *."*k* Once again the General Assembly was authorized to act as a court of last resort. The charter was accepted by the freemen assembled in Newport in late November 1663. In the Royal Charter the terms "General Court" and "General Assembly" were used synonymously and interchangeably. Even to this date the Massachusetts Legislature is called the General Court.*l* The charter also provided for the election by the Governor, deputy Governor, assistants, and the company of a successor to any officer of said company who died or was removed from his position for any misdemeanor or default before the general day of election.*m*

Subsequently, on May 1, 1666, the General Court of Trials and General Jail Delivery was created. Annual sessions were scheduled, with one to be held in Newport on the last Tuesday of March and a second on the first Tuesday of September. The court was to consist of the governor, the deputy governor, and assistants, with the governor or the deputy and three assistants comprising a quorum.*n* A litigant could take an appeal to the General Assembly, which was authorized to alter, amend, or reverse such judgments and give a new judgment thereupon "as to the said assembly shall appear to be agreeable in law and equity."*o*

In the summer of 1719 the General Assembly became a bicameral legislature, with the governor, deputy governor, and assistants sitting as the "upper" house and the deputies of the several towns comprising the "lower" house. Appeals were to be considered by the upper and lower houses meeting in grand committee. Further appeals in certain cases could be made to His Majesty in council.*p* The court established in 1666 was renamed the Superior Court of Judicature, Court of Assize, and General Jail Delivery. The change in name did not result in the replacement of court personnel, and appeals were still to be taken to the General Assembly and from there to the King in council.*q*

In 1746 the General Assembly provided that the Superior Court of Judicature was to consist of one chief judge and four other judges to be chosen annually by the General Assembly. Three of the justices would constitute a quorum, and the court would have the same authority as exercised in His Majesty's kingdom by the Court of Common Pleas, King's Bench, or Exchequer.*r*

In 1798 the name of the court was changed to that of the Supreme Judicial Court, the name which was retained until 1842. There was to be one chief justice and four associate justices, and the court was to have cognizance over all actions of a civil nature and of all crimes or offenses of a public nature. The 1798 legislation further provided that the justices were to be appointed by the General Assembly in grand committee at the general elections in May, and the appointees were to hold their offices for the term of one year "liable, nevertheless, to be removed for misbehavior or inability to discharge their respective duties through sickness or other infirmity by a vote of the general assembly." The act also provided that no justice should be a member of either house of the General Assembly.s Although the judiciary might now have assumed its proper rank as a branch of state government, it is clear that little concern was shown by the Legislature for such matters as judicial independence or tenure.

The right to vote was reserved to the freemen—white, male adults who owned or possessed an interest in their own right in real estate of a specific value that fluctuated with the passage of time. Up until the time of the Revolutionary War, this requirement was considered to be quite reasonable because 75 percent of the white, adult, male population satisfied the freehold requirement.t However, as the colony began to grow in the mid–1800s, there began a decline in the once favorable ratio of land to man. The growing urbanization of Providence was one of several factors that contributed to the disenfranchisement of many city dwellers and an increasingly malapportioned Legislature. For instance, Newport, with a population of just over 8,300, was represented by six legislators, whereas Providence, with a population in excess of 23,000, sent but four individuals to the General Assembly.u This state of events produced a growing agitation for the adoption of a Constitution which would replace Charles II's charter.

Several attempts at enacting a Constitution met with little success. A Constitution was framed in 1824 and submitted to the people, who rejected it. Time marched on and in 1834 another Constitutional Convention was assembled but dissolved for want of a quorum.v Later, in early October 1841, a "People's Convention," convened under the leadership of Thomas W. Dorr, produced a Constitution which Dorr adherents claimed was ratified by a majority of the electorate when the votes were tallied in January 1842.w However, the legal "Charter" government refused to accept the Constitution and responded in February 1842 with a "Landholders'" or "Freemen's" Constitution. This effort was no more successful than the previous undertakings.x Finally, after Dorr's Rebellion had been suppressed, a Constitution adopting many of the provisions of the Landholders' Constitution and some of the People's Constitution was adopted by the General Assembly on November 5, 1842, and was ratified later that month. The Constitution became effective on May 4, 1843, and has since that date been the repository of Rhode Island's fundamental law.y

As adopted, the Constitution provided for distribution of governmental power "into three departments: the legislative, executive and judicial." The franchise was expanded, the Legislature was reapportioned, and legislation providing for the direct election of general officers was adopted. Provisions calling for the election of Supreme Court justices by the grand committee and the holding of two sessions of the General Assembly—in May and October of each year—were retained.

Despite a constitutional distribution of the power of government among the legislative, executive, and judicial departments, the General Assembly was reluctant to divest itself of the power it had exercised for so long over the judicial department. This was particularly true with respect to the Legislature's equitable powers and the Assembly's long-standing willingness to act as an appellate court.

The initial confrontation between the judicial and legislative branches came in 1854 when the General Assembly ordered a new trial for garnishees of a company that was indebted to another firm. Prior to the ordering of a new trial, a judicial panel had rejected the garnishees' claim that they had failed to file the requisite affidavits because of accident or mistake. Chief Justice Samuel Ames in *G. & D. Taylor Co. v. Place*, 4 R.I. 324 (1856), after classifying the Assembly's actions as an exercise of judicial power, explained that the new Constitution "provided a supreme court, as the ultimate state tribunal" in which was vested "the whole judicial power of the state * * * and in such inferior tribunals as the general assembly might set up." The Supreme Court ruled that the actions of the General Assembly were "unconstitutional and void."

Although the court might have been supreme in the exercise of judicial powers, Chief Justice Ames conceded that he and his colleagues had only a "comparatively stable tenure of office" under the Constitution because, as he obviously believed, the power to elect the justices of the Supreme Court, and conversely to declare their places vacant without a showing of cause, was a legislative function, still entrusted to the General Assembly.

In *Gorham v. Robinson*, 57 R.I. 1, 24–25, 186 A. 832, 844–45 (1936), the late Justice William A. Moss, in expressing the sentiments of the majority, wrote that if the framers of the constitution had intended to bestow upon the state judiciary the judicial independence enjoyed by our federal counterparts, they would have employed the language found in Art. III, sec. 1, of the United States Constitution. The article provides that judges, both of the supreme and inferior courts, shall hold their offices during good behavior and shall, at stated times, receive for their services a compensation which "shall not be diminished during their continuance in office." In 1842, the justice noted, the framers "were willing to remove from the legislative department judicial powers and vest them in the courts, but they were not willing, apparently, to put any of those courts, not even this court, beyond reach of the general assembly." Justice Moss also emphasized that the power of removal was "something much more potent than removal by address and really had the effect of retaining in the general assembly a great part of its former power of electing judges of the Supreme Court annually, if it chose to do so."[7] The provision in art. X, sec. 6, that the judges of this court should receive an undiminished compensation during their continuance in office, he observed, was "a small concession to the independence of the supreme judiciary, in view of the precarious tenure which was provided in Sec. 4." The issue before the court in the *Gorham* case was whether the General Assembly could remove certain District Court judges and clerks by reducing their terms from six to three years, and the majority of this court, for the reasons alluded to earlier, was of the belief that the Assembly could shorten or lengthen judicial terms at will.

My colleagues have already referred to the only occasion during the 140–plus years that have elapsed since the state's constitution became effective when the General Assembly invoked its power to remove a justice of this court. It occurred on Tuesday, January 1, the first day of the January 1935 session, with the passage of five joint resolutions, each of which vacated the positions of either the chief justice or the four associate justices of the Supreme Court. Each resolution contained a provision calling for the acceleration of pension benefits payable to members of this court pursuant to P.L.1926, ch. 771, § 2, upon the filing of a certificate with the Secretary of State indicating that each justice had "turned

---

7. Removal by address is a formal request of the Legislature addressed to the executive that an officer appointed by the latter department be removed by that department. Since the constitution vests the election of judges of this court in the grand committee, there was no reason to include the provision for a removal by address.

over his office and official papers to his successor without in the meantime having performed any of the functions of his office."[8] "The proceedings in grand committee" for that date reveal that the "[t]wo houses of the general assembly met in grand committee for the purpose of electing certain officers," including "Chief Justice of the Supreme Court.—Edmund W. Flynn, of Providence, to fill the place of the honorable Charles F. Stearns" as well as four other individuals to fill the places of the four incumbent associate justices. Rhode Island Acts and Resolves of 1935, 433–34.

No suggestion was made that any of the five former justices had been guilty of any malfeasance or dereliction of duty. They were simply removed by the General Assembly sitting in grand committee, the same body that had elected them to office, acting pursuant to art. X, sec. 4.

The constitutional power to remove a judge is not unique to Rhode Island. In fact, provision for legislative removal, either by acting alone or by way of address to the chief executive, is to be found in the constitutions of eight of the thirteen original colonies. They are Connecticut,[9] Maryland,[10] Massachusetts,[11] New Hampshire,[12] New York,[13] North Carolina,[14] South Carolina,[15] and Rhode Island. In three of the

eight states—New York, North Carolina, and Rhode Island—removal may be effectuated exclusively by legislative action. In the other five, the actual removal is ordered by the Governor after having been addressed by the Legislature. The constitutions of Connecticut, Massachusetts, and Rhode Island contain no requirement that removal must be for cause or that the judge is entitled to notice and a hearing. In the other five states, removal must be for cause, and the judge in question is entitled to a statement of the charges and an opportunity to be heard. It should be noted that while the removal power is applicable to the misbehaving judge, it is especially suitable in instances in which an obstinate judge refuses to relinquish the office even though his physical or mental disability makes it impossible for the jurist to perform his or her judicial duties. Thus, the General Assembly acted with commendable foresight in 1798 when it provided that the justices of the Supreme Judicial Court could be removed for misbehavior or the "inability to discharge their respective duties through sickness or other infirmity."

Having highlighted the centuries of complete indifference on the part of the Rhode Island electorate to affording any degree of job security to the members of this court

---

8. The Providence Journal for Wednesday, January 2, 1935, reported in a front-page article that four of the new members had taken their oaths of office and that the fifth, who was Francis B. Condon then a member of Congress, was expected to return to Rhode Island on the following day. On Thursday, January 3, 1935, the Journal reported that the five former justices had relinquished their places by signing stipulations to the effect that they would perform no further judicial functions. Shortly after 1 o'clock on Wednesday, January 2, the Secretary of State was officially notified of the filing of the statements. Later in the afternoon the four newly elected justices assumed the bench, the calendar was called, and the cases were reassigned so that the court could have a "breathing spell." Copies of the oath taken by the new Chief Justice and the certificate filed by the departing Chief Justice are attached to this opinion in the Appendix. The certificates filed by each of the four departing Associate Justices were identical to that of the Chief Justice.

9. Article V, sec. 2, Constitution of Connecticut, 1965, as amended November 24, 1982.

10. Article IV, Sec. 4, Constitution of Maryland, 1867, as amended November 4, 1980.

11. Part 2, cl. 3, Art. I, Constitution of Massachusetts, 1780, amended November 7, 1972.

12. Part 2, Art. 73, Constitution of New Hampshire, 1784, as amended in 1966.

13. Article VI, sec. 23(a), Constitution of New York, 1894, as amended.

14. Article IV, sec. 17(1), Constitution of North Carolina, 1970, as amended.

15. Article XV, sec. 3, Constitution of South Carolina, 1895, as amended.

and having noted the purpose served by the removal clause, I will now set forth the rationale for my belief that today the grand committee's power to remove a justice of the court remains a viable and vital part of the Rhode Island Constitution. My colleagues' judicial excision of the grand committee's removal power because of "an inadvertent repeal" is completely at odds with the well-established doctrine concerning implicit repeal of enactments, be they statutory or constitutional in character. A repeal by implication will be countenanced and preference given the last enactment only if the enactments in question are so irreconcilably repugnant to each other that the two enactments cannot stand together. *State v. Sousa*, 456 A.2d 775, 781 (R.I. 1983). My colleagues' belief that the grand committee's removal power is restricted "to the day upon which the annual session for the election took place" overlooks the pertinent language of art. X, sec. 4, which states that "such resolution [of removal] shall not be entertained at any other than the annual session for the election of public officers." Section 4 speaks in terms of a session rather than a day, and art. IV, sec. 3, makes it clear that the Newport session, so called, will consider election matters "and other business." Thus, the Newport session was not devoted exclusively to the election of public officers, but it could, and did, entertain other business.

An informative and interesting insight as to what actually transpired in the legislative chambers before the turn of the nineteenth century can be gained from an examination of an advisory opinion given by five of our predecessors on February 6, 1902, to the then-Governor Charles Dean Kimball. In his request, the Governor sought the justices' advice because John H. Stinness, who was then an Associate Justice of this court, had been elected Chief Justice, succeeding Charles Matteson. The election took place on May 29, 1900. The next day, May 30, John T. Blodgett was elected to fill the vacancy caused by Stinness' elevation to the chief justiceship. The Governor sought the justices' advice as to the length of the respective terms to be served by each justice, having in mind the provisions of art. X, sec. 4, and art. XI of the amendments, secs. 7 and 12. The five responding justices[16] first observed:

"[T]he election of a judge of the Supreme Court for the full term of the office, * * might be had at any time during the May session or any continuation or adjournment thereof. The election of general officers in grand committee seldom, if ever, occurred on the first day of the session; and what might be done on the second day might be done on any subsequent day of the same session, however long continued." *Opinion to the Governor*, 23 R.I. 635, 641, 51 A. 221, 223 (1902).

The justices then went on to say:

"As we have seen * * * section 5 of article X of the constitution recognized the fact that there were then established two annual sessions of the General Assembly, one for the purposes, primarily, of election, the other for general business. At the first, a judge of the Supreme Court might be elected for the normal term; and at that session any judge might be removed; at the other session, if a vacancy occurred it could

---

**16.** At the time of the justices' response, the Supreme Court consisted of seven justices and two divisions—an appellate division and a common-pleas division. The appellate division exercised an appellate function, and the common-pleas division was a trial court exercising general jurisdiction in the areas of law and equity. The court was performing these functions pursuant to the provisions of the Judiciary Act of 1893 which had created the state's District Court. The Superior Court came into being with the adoption of the Court and Practice Act of 1905 and took over the function of the common-pleas division. The Court and Practice Act came about as a result of the adoption of the Twelfth Amendment, which gave the Supreme Court final revisory and appellate jurisdiction over all questions of law and equity as well as the power to issue prerogative writs and to exercise such other jurisdiction as may from time to time be prescribed by law. *See* Report of the Commission to Recommend Changes in the Law Necessary to Carry into Effect Article XII of Amendments to the Constitution, III–XI.

only be filled until the next election session. The new article [Article XI of the Amendments] abolishes the second session absolutely and leaves the single session, at which any regular election of general officers must take place. The single session, at Providence * * * takes the place of the May session at Newport formerly provided for, and an election of a judge at that session * * * is necessarily for the normal term."

Therefore, the Governor was advised that justices elected in late May of 1900 were elected to hold office as provided in sec. 4 of art. X of the Constitution and not merely until the next annual election. The only possible exception, in the justices' opinion, was a judge who was chosen to fill a vacancy at a special or extraordinary session called by the Governor pursuant to art. VII, sec. 7, after the annual session has adjourned.

Particularly pertinent to the question now before us are the observations by the justices that the elections of judges of this court and the general officers could, and often did, occur at times during the May session other than the first or second day. Of more significant interest is the justices' conclusion that art. XI of the amendments abolished the second session absolutely and left a single session, and the single session in Providence took the place of the May session in Newport.

The November 1911 adoption of the sixteenth amendment, with its requirement for biennial elections, is totally irrelevant, in my opinion, to the current status of the Legislature's power to remove a Supreme Court justice. What is significant is the continued existence of the eleventh amendment's mandate that there shall be an annual session of the General Assembly at Providence beginning on the first Tuesday of January in each year. This session is the so-called Newport session referred to in the Constitution.

I would concede that art. X of amendments, with its provision for a victory by a plurality of votes, might have reduced the occasions when the legislators would be called upon to exercise their ability to elect general officers. However, sec. 3 of the eleventh amendment continues to authorize the General Assembly to elect some person to office in instances where there has been a tie vote or a failure to elect a candidate or when the victorious candidate for general office is so incapacitated, either physically or mentally, that a replacement must be made. Vacancies in the offices of Secretary of State, Attorney General, or General Treasurer mandate an election by the grand committee, and similar sentiments are expressed in G.L.1956 (1981 Reenactment) chapter 2 of title 17. It should be emphasized that for many years subsequent to the turn of the century justices of the state's District Court were elected in grand committee, as witness the case of *Carpenter v. Sprague,* 45 R.I. 29, 119 A. 561 (1923), and that the sheriff of Providence County was also subject to being elected by grand committee. *Sanders v. Rice,* 41 R.I. 127, 102 A. 914 (1918). The General Assembly on Tuesday, January 21, 1958, met in grand committee, accepted the resignation of William E. Powers as Attorney General,[17] and went on to elect J. Joseph Nugent to the office of Attorney General. Journal of the House of Representatives, Tuesday, January 21, 1958, pp. 3 and 4. I would also stress that G.L.1956 (1984 Reenactment) § 35-8-3 establishes the Sinking Fund Commission, which consists of the Governor, the General Treasurer, the Director of Administration, the respective chairpersons of the Senate Finance Committee and the Finance Committee of the House of Representatives and "two persons to be elected by the general assembly in grand committee, one of whom shall be elected at the January session in each

---

17. Earlier in the January 1958 session, specifically, Tuesday, January 7, 1958, at a meeting of the grand committee Associate Justice Francis B. Condon was elected Chief Justice of the Supreme Court to succeed Edmund W. Flynn, who had deceased, and William E. Powers was elected as an Associate Justice to succeed Justice Condon.

year to succeed the member of the said commission whose term will next expire." Here again is an example where the Legislature has retained the power to elect public officers as opposed to general officers.

I see no irreconcilable repugnance within the amendments to the Constitution which would justify the implicit repeal of the grand committee's ability to remove a justice of this court, and in reaching this conclusion, I am of the opinion that the various amendments to the Constitution dealing with the length of the legislative session did nothing more than eradicate the second session and that the Newport or election session continues to be alive and well as a part of our Constitution. The power to remove as well as the power to elect the justices of the Supreme Court is still embodied within the Constitution to be employed when the occasion demands. Thus, I would hold that the justices of this court can be removed by the grand committee at any time during the regularly scheduled annual session.

Before going on to consider whether or not the Legislature's adoption of the Motherway resolution would constitute a bill of attainder, I wish to express my doubt as to the propriety of entertaining the issue of attainder which was raised by the Chief Justice's counsel in his brief submitted as amicus curiae. Our constitutional responsibility, of course, is to respond to the question posed. Whether or not we have a responsibility to respond to every issue that might be raised by an amicus is an open question. My doubt is further compounded when a consideration is given to the question of whether the claim of attainder is premature. When the question of the power of the Legislature to exercise its removal powers was argued before us on November 25, 1985, the members of this court had no assurance that the Motherway resolution could pass both legislative branches "by * * * a majority of all members elected to the house in which it may originate and be concurred in by the same majority of the other house." Article X,

sec. 4. Putting aside my doubts as to propriety and maturity, I turn now to my associates' advice as to the attainder defense.

My colleagues maintain that proposed Resolution 85–S16 is, in light of the circumstances of its introduction, violative of the prohibition contained in Article I, sec. 10, of the Constitution of the United States against the passage by a state of a bill of attainder. I disagree.

The term "bill of attainder" originally applied to legislative enactments which imposed death upon named or described persons or groups for high crimes, "attainting" the victims, and prohibiting inheritance of their property, without the benefit of a judicial trial. *Nixon v. Administrator of General Services*, 433 U.S. 425, 473–74, 97 S. Ct. 2777, 2805–06, 53 L.Ed.2d 867, 910 (1977); L.H. Tribe, *American Constitutional Law* 484 (1978). Acts imposing sanctions less drastic than death in the same manner were known as "bills of pains and penalties." These sanctions were usually directed at persons considered disloyal to the Crown or the State. *Id.* Early on in the development of constitutional litigation in this area, the prohibition against attainder was held to apply to bills against pains and penalties as well. *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356, 363 (1867). As Chief Justice Marshall observed, "[a] bill of attainder may affect the life of an individual, or may confiscate his property, or may do both." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 138, 3 L.Ed. 162 (1810).

As noted by my colleagues, the Attainder Clause was intended to implement the doctrine of the separation of powers—to act as "a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature." *United States v. Brown*, 381 U.S. 437, 442, 85 S.Ct. 1707, 1711–12, 14 L.Ed.2d 484, 488 (1965). The clause "reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthi-

ness of, and levying appropriate punishment upon, specific persons." *Id.* at 445, 85 S.Ct. at 1713, 14 L.Ed.2d at 490. However, I do not believe that the resolution to vacate the seat of the Chief Justice offends the intent of the framers, because it does not constitute the exercise of a "judicial function"; it does not adjudge guilt; and it does not punish. It is rather an appropriate exercise by the Legislature of its ability to declare a seat of a Supreme Court justice vacant without cause—a legislative function intentionally granted it by the people of Rhode Island in adopting their Constitution. *Gorham v. Robinson*, 57 R.I. at 18, 24–25, 186 A. at 842, 844–45.

Current cases decided by the United States Supreme Court provide a framework for the analysis of a possible bill of attainder. It has most recently been defined as " 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.' " *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, ——, 104 S.Ct. 3348, 3353, 82 L.Ed.2d 632, 640 (1984). There are thus three elements of a bill of attainder—(1) specification of the affected persons, (2) punishment, and (3) lack of judicial trial. *Id.*

There is no question that Resolution 85–S16 refers to the Chief Justice by name. It does not, however, automatically offend the Bill of Attainder Clause thereby. An examination of *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L. Ed.2d 867 (1977), is instructive in this regard.

At issue in *Nixon* was the Presidential Recordings and Materials Preservation Act (act), title I of which in essence provided that the Administrator of General Services should take custody of former President Nixon's papers and tape recordings, subject to screening of the materials by government archivists and the return of his private papers to him. Attacking the act as an invalid bill of attainder, Mr. Nixon faulted the legislation for singling him out as opposed to all other Presidents or members of the government for disfavored treatment.

The Supreme Court noted that although title I dealt exclusively with Nixon's papers, title II of the act cast a "wider net" by establishing a special commission to study and recommend appropriate legislation regarding the preservation of the records of future Presidents and all other federal officials. 433 U.S. at 472, 97 S.Ct. at 2805, 53 L.Ed.2d at 909. The Court stated that Congress's action in preserving only Nixon's papers was easily explained by the fact that at the time of the act's passage, only his materials required immediate attention, the presidential papers of other former Presidents having already been housed in functioning presidential libraries and Nixon alone having entered into an agreement which by its terms called for the destruction of certain of his materials. On this basis, the Court held that Nixon constituted a "legitimate class of one." *Id.*

The Chief Justice similarly constitutes a "legitimate class of one" in Resolution 85–S16 in relation to art. X, sec. 4, of the Rhode Island Constitution, which has been in effect since 1843 and under which he assumed office. Article X, section 4, provides in general that the Legislature can declare the place of a Supreme Court judge vacant by a resolution of the General Assembly to that effect, with no cause specified. Resolution 85–S16 is directed at the Chief Justice in his capacity as such a judge; its specificity, no matter what its cause, is therefore justifiable.

The Legislature's use of this power once before in 1935, a proposition disputed by my colleagues but which I maintain is true, makes any question as to the validity of the resolution because of its specificity even more inappropriate. Unlike President Nixon in the case of the Presidential Papers Act, the Chief Justice would not be the only one of his "class" to have felt the effect of art. X, sec. 4, were his place to be declared vacant.

Even if the specificity element were satisfied by Resolution 85–S16, the Bill of Attainder Clause would not necessarily be implicated. The clause is offended only if the enactment in question inflicts punishment. *Selective Service System*, 468 U.S. at ——, 104 S. Ct. at 3355, 82 L.Ed.2d at 643.

A severe sanction does not ipso facto become punishment. *Flemming v. Nestor*, 363 U.S. 603, 616, 80 S.Ct. 1367, 1375, 4 L.Ed.2d 1435, 1447 (1960). Burdensome consequences imposed by an act are not necessarily punishment:

" 'The fact that harm is inflicted by governmental authority does not make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed. But there may be reasons other than punitive for such deprivation.' " *Selective Service System*, 468 U.S. at ——, 104 S.Ct. at 3355 n.8, 82 L.Ed.2d at 643 n.8, (*quoting United States v. Lovett*, 328 U.S. 303, 324, 66 S.Ct. 1073, 1083, 90 L.Ed. 1252, 1264 (1946) (Frankfurter, J., concurring) ).[18]

"The deprivation of any rights, civil or political, previously enjoyed, may be punishment, *the circumstances attending and the causes of the deprivation determining this fact.*" (Emphasis added.) *Cummings v. Missouri*, 71 U.S. (4 Wall.) at 320, 18 L.Ed. at 362. Thus, the " 'highly particularized context' " of each case must be examined to determine if attainder-type punishment exists. *Selective Service System*, 468 U.S. at ——, 104 S.Ct. at 3355, 82 L.Ed.2d at 643.

In examining the context of a case to decide if an enactment constitutes punishment, three inquiries are in order: (1) whether the deprivation in question falls within a category historically held to be proscribed by the Bill of Attainder Clause;

(2) whether the enactment can be said to further a nonpunitive purpose; and (3) whether the legislative record "evinces a congressional intent to punish." *Nixon v. Administrator of General Services*, 433 U.S. at 473, 475–76, 478, 97 S. Ct. at 2805, 2806–07, 2808, 53 L.Ed.2d at 910, 911–12, 913.

Legislation barring individuals or groups from participation in specific employment or professions has historically been held to constitute punishment. Thus, the United States Supreme Court struck down a Missouri constitutional provision barring clergymen from the ministry unless they subscribed to an oath that they had not participated· in the Confederacy, *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 18 L. Ed. 356 (1867); a congressional enactment barring attorneys from practice for similar reasons, *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867); a federal statute which prohibited the payment of compensation to three named government employees who had been charged with subversive activities and investigated by the House Unamerican Activities Committee, *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946); and an Act of Congress making it a crime for a member of the Communist Party to serve as an officer of a labor union except in a clerical or custodial capacity. *United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L. Ed.2d 484 (1965). However, in each of these cases, the "circumstances attending and the causes of deprivation" differ substantially from the Chief Justice's situation so as to distinguish the deprivation here from punishment.

First, it must be noted that in none of the cases cited did the Legislature have the right the General Assembly has here, as appointing body, to remove the persons involved from office for any or no cause at

---

**18.** Justice Frankfurter concurred in *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), but disagreed with the majority as to the applicability of the Bill of Attainder Clause to the facts in that case. The Court's reliance on his concurrence in its most recent pronouncement, *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, ——, 104 S.Ct. 3348, 3355 n.8, 82 L.Ed.2d 632, 643 n.8 (1984), would indicate that the Court is moving toward a more restricted concept of punishment.

all.[19] The Chief Justice assumed office on these terms; his right to serve was thus circumscribed from the day he took his oath of office. Although for bill-of-attainder purposes his removal from his "circumscribed" office would still be considered a "deprivation of a right previously enjoyed," *Cummings v. Missouri*, 71 U.S. (4 Wall.) at 320, 18 L.Ed. at 362, the open-ended legislative power to which he is subject allows for the possibility that removal in this case could be for a purpose other than punishment.[20] Furthermore, in sharp contrast to the case before us, participation in particular activities thought to be a threat to the national security, in the past, in *Cummings* and *Garland*, or in the future, as · could

possibly be the case in *Brown*, is the specifically stated cause of the deprivation. In *Cummings, Garland*, and *Brown* the legislation involved mentioned the conduct or activity perceived as a threat; in *Cummings* and *Garland*, the inability of the persons involved to disclaim that conduct by taking the legislatively required oath conclusively determined their guilt.

No mention is made, either in art. X, sec. 4, or in Resolution 85–S16, of particular activities at which the vacation of office is directed.[21] No offense is named, and no declaration of guilt is made. There is thus no overt evidence of "the substitution of a legislative for a judicial determination of guilt," a distinguishing feature of a bill of

---

**19.** With the exception of *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), government employment was not at issue in these cases. In *Lovett*, the affected employees were executive appointees. Thus, the Legislature would have no basis in any of the cases cited for excluding the persons involved from their employment other than for the particular activities cited. This distinction was made clear in *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867), where the Court, in declaring invalid the legislative denial to an attorney of the right to practice his profession, stated that

"[t]he profession of an attorney * * * is not like an office created by an Act of Congress, which depends for its continuance, its powers, and its emoluments, upon the will of its creator, and the possession of which may be burdened with any conditions not prohibited by the Constitution." *Id.* at 378, 18 L. Ed. at 370.

**20.** Although not strictly pertinent here, I dispute my colleagues' conclusion that the Chief Justice has a "fully protectible interest" in his employment for due process purposes. A protectible interest in government employment exists if the state creates a legitimate expectation of the continuation of such employment. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972). Such an expectation

"is created and [its] dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and support claims of entitlement to those benefits." *Id.*

The sufficiency of a claim of entitlement must be decided by reference to state law. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684, 690 (1976). In *Montaquila v. St. Cyr*, 433 A.2d 206, 212 (R.I.1981), this court

adopted the rule in *Roth* and held that a town solicitor and his assistants, who had been discharged for purely political reasons, had no legitimate claim of entitlement to continued employment. Under the town charter, the solicitor served at the pleasure of the town manager, and the assistant solicitors served at the pleasure of the solicitor; there was nothing to indicate there had been any understanding to the contrary.

Rhode Island law conclusively indicates that Supreme Court justices serve at the will of the General Assembly. R.I. Const., art. X, sec. 4; *G. D. Taylor Co. v. Place*, 4 R.I. 324, 352 (1856); *Gorham v. Robinson*, 57 R.I. 1, 24–25, 186 A. 832, 844–45 (1936). The entire bench was vacated in 1935 in accordance with art. X, sec. 4. Furthermore, Constitutional Conventions in 1955 and 1964–1968 proposed amendments to art. X which would have granted tenure to Supreme Court justices, proposals which were subsequently turned down by the electorate. *Proceedings of the Limited Constitutional Convention of the State of Rhode Island, June 20, 1955*, 68–86; *Providence Journal Almanac* 249 (1955); E. Cornwell and J. Goodman, *The Politics of the Rhode Island Constitutional Convention*, 44, 80 (1969).

Thus, contrary to the conclusions of my colleagues, neither the law nor the facts provide an "understanding of tenure" upon which the Chief Justice can legitimately base a claim of a protectible interest for due process purposes.

**21.** Resolution 85–S16 reads as follows:

"RESOLVED, that the position of chief justice and chief judge of the Rhode Island Supreme Court held by Joseph A. Bevilacqua, is declared vacant.

"This resolution is pursuant to Article X, Section 4 of the Rhode Island Constitution."

attainder. *De Veau v. Braisted,* 363 U.S. 144, 160, 80 S. Ct. 1146, 1155, 4 L.Ed.2d 1109, 1120 (1960). There is also no basis in the resolution as framed upon which to conclude that the vacation proposed is punishment.

In *Lovett,* the legislative enactment more closely resembles the one here. A congressional subcommittee had found that three particular federal employees were guilty of having engaged in subversive activities, and Congress subsequently enacted legislation denying them compensation, without specific mention of the activity in question. Nonetheless, this denial operated, according to the Court, as a " 'legislative decree of perpetual exclusion' from a chosen vocation," and therefore inflicted punishment. *United States v. Lovett,* 328 U.S. at 316, 66 S.Ct. at 1079, 90 L.Ed. at 1260.

Admittedly, here, comparable to *Lovett,* proposed Resolution 85–S16 was revivified subsequent to an investigation which resulted in the entry of an order on June 20, 1985, in which the Chief Justice agreed that he had engaged in conduct violating Canons 4 and 29 of the Canons of Judicial Ethics and that such conduct had brought his judicial office into serious disrepute. My colleagues contend that under these circumstances any positive action upon the resolution by the General Assembly would have to be construed as punishment.[22]

However, in the more recently decided *Nixon v. Administrator of General Services,* President Nixon similarly argued that the act denying him custody over his tapes should be construed as punishment given the social and political reality of the times. The Court recognized that these realities existed, but held that it was

"not free to invalidate Acts of Congress based upon inferences that we may be asked to draw from our personalized reading of the contemporary scene or recent history. In judging the constitution-

ality of the Act, we may only look to its terms, to the intent expressed by Members of Congress who voted its passage, and to the existence or nonexistence of legitimate explanations for its apparent effect." *Nixon,* 433 U.S. at 484, 97 S.Ct. at 2811, 53 L. Ed. 2d at 916–17.

*See also United States v. Lovett,* 328 U.S. at 326, 66 S.Ct. at 1084, 90 L.Ed. at 1265 (Frankfurter, J., concurring) ("for purposes of characterizing the deprivation of [a] statute as punishment * * * presumed motive cannot supplant expressed legislative judgment").

Furthermore, even if it is conceded that any effort in late 1985 to bring Resolution 85–S16 before the Legislature for a vote was in direct response to the actions of the Judicial Tenure Commission, that does not necessarily mean that the purpose of such action was punishment. Other legitimate explanations exist:

"The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession." *De Veau v. Braisted,* 363 U.S. at 160, 80 S. Ct. at 1155, 4 L.Ed.2d at 1120.

In *Cummings v. Missouri,* the Court distinguished between establishing qualifications for a particular job and exacting punishment for conduct perceived as a threat, noting that qualifications relate to the fitness or capacity of a party for a pursuit or profession. The Court stated that whether or not a clergyman sympathized with the Confederacy bore no relation to his fitness for the ministry; the newly adopted constitutional provision barring him from practice unless he took an oath that he had not participated "by act or

---

**22.** Resolution 85–S16 was originally introduced on January 1, 1985, and referred to the Senate Judiciary Committee. It lay dormant until well after the results of the Judicial Tenure Commis-

sion's investigation were announced on June 20, 1985. The request for this advisory opinion was not received until October 11, 1985.

word" of sympathy in the Confederacy was held to be directed "at the person" and not at "the calling" and therefore to have a punitive purpose. *Cummings v. Missouri,* 71 U.S. (4 Wall.) at 319–20, 18 L.Ed. at 361–62.

Here, as contrasted with *Cummings,* the laws violated by the Chief Justice—the Canons of Judicial Ethics—were in effect before the Chief Justice took office in April 1976, and are *by specific admission of the Chief Justice himself,* in his agreement accepting the Judicial Tenure Commission's censure, related to his qualification for office.[23] If it is agreed that his proposed removal is connected to his prior conduct, since his conduct relates to his "calling," it can legitimately be claimed that the purpose of his proposed removal is not to punish the person, but to regulate the judicial profession—to maintain the integrity of, and the public confidence in, the state's judiciary.[24]

No one can dispute that a significant purpose of judicial-removal statutes is the preservation of the public confidence in the credibility and integrity of the judicial system. *See Matter of Coruzzi,* 95 N.J. 557, 472 A.2d 546, 553 (1984), and cases cited therein. The purpose of judicial discipline in general is not to punish individual judges, but to maintain the high standards of the judiciary and the proper administra-

tion of justice. *In re Wright,* 313 N.C. 495, 329 S.E.2d 668, 671 (1985).

In *Matter of Coruzzi,* the respondent charged that an amendment to the removal statute, authorizing the indefinite suspension of his pay during a removal proceeding was an ex post facto law and a bill of attainder. In discussing the requirement of punishment for purposes of both ex post facto and bill of attainder analysis, the New Jersey Supreme Court distinguished clearly between the purpose of a statute and its effect upon an individual:

> "One does not have a constitutional right not to be subject to a law if its effect might be called punitive * * *. The appropriate focus is not simply the effect on the individual challenging the statute, but also other potential or intended objects of the law's operation to determine if the challenged restriction serves a valid regulatory purpose." 472 A.2d at 557.

The court concluded that the amendment served the valid purpose of preserving confidence in the judiciary; that plus the lack of express punitive purpose defeated the respondent's bill of attainder claim. *Id.* at 558.

Furthermore, given the circumstances surrounding this controversy, removal was the least burdensome alternative by which the General Assembly could have achieved its legitimate objective, a factor to be considered in determining whether a Legisla-

---

23. The Canons of Judicial Ethics were incorporated into Supreme Court Rule 48 by order entered May 29, 1974. In the order entered by the Judicial Tenure Commission, the Chief Justice agreed that he had engaged in conduct violating Canons 4 and 29, and that "it is essential for a judge to avoid the appearance of impropriety and to adhere scrupulously to the Canons of Judicial Ethics."

24. Regulation of a profession is also distinguishable from the "prevention of future misconduct" held to constitute punishment in *United States v. Brown,* 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). In *Brown* the government had argued that the legislation making it a crime for Communists to hold union office was enacted for preventive rather than retributive reasons— to keep Communists from positions in which they could bring about undesirable events in the

future. The Court held that "[i]t would be archaic to limit the definition of 'punishment' to 'retribution[,]'" punishment serving several purposes, "retributive, rehabilitative, deterrent— and preventive." *Id.* at 458, 85 S.Ct. at 1720, 14 L.Ed.2d at 497.

The focus here is not the prevention of future misconduct by the Chief Justice, but valid regulation so as to promote the public confidence in an untarnished judiciary. As concluded by a noted authority on American constitutional law, "[e]ven under the expansive view in *Brown,* legislatively inflicted disabilities will continue to escape the attainder ban unless they contain stigmatizing elements suggesting that they go beyond anything reasonably necessary for valid government regulation." L.H. Tribe, *American Constitutional Law,* 488 (1978).

ture intended to inflict punishment. *Nixon*, 433 U.S. at 482, 97 S.Ct. at 2810, 53 L.Ed.2d at 916.

The legislatively prescribed procedure for handling alleged judicial misconduct was somewhat skirted by the Judicial Tenure Commission when it struck an agreement with the Chief Justice arriving at a disposition of the matter without certifying the commission's recommendation to this court for possible affirmation, modification, or rejection. General Laws 1956 (1985 Reenactment) §§ 8–16–4(d); 8–16–5; 8–16–6(a); 8–16–7(a). As such, the General Assembly could not rely on the results of those proceedings—censure and suspension—to instill public confidence.

Left with a choice between removal and impeachment to accomplish its purpose, the General Assembly undoubtedly chose the least burdensome alternative. It may well have chosen removal to protect the Chief Justice from the far more intrusive and punitive inquiry into his conduct required by the impeachment process. *See Nixon*, 433 U.S. at 483, 97 S.Ct. at 2810–11, 53 L.Ed.2d at 916. Moreover, the removal process is not as burdensome to the public as is the cumbersome, costly, and lengthy impeachment process. *See generally In re Peoples*, 296 N.C. 109, 250 S.E.2d 890 (1978), *cert. denied*, 442 U.S. 929, 99 S. Ct. 2859, 61 L.Ed.2d 297 (1979).

To conclude, proposed Resolution 85–S16 contains no express mention of conduct at which vacation is directed. On its face it cannot be construed as punishment. Additionally, it furthers a valid nonpunitive purpose—that of regulating the judiciary—and it is the least burdensome of the alternatives available to the Legislature to accomplish that purpose. Furthermore, there are, to my knowledge, no records of proceedings surrounding the introduction of the resolution or the submission of the question of its validity to this court which indicate that the intention of the General Assembly was punitive.[25]

It cannot, therefore, be held that the vacation proposed in this instance was intended as punishment; as such the critical element of a bill of attainder is missing. Nor, as we have seen, is the specificity of the resolution problematic.[26] I therefore hold that proposed Resolution 85–S16 is not violative of the Bill of Attainder Clause of the United States Constitution, article I, section 10.

Since I am of the belief that the General Assembly retains the power to remove a justice of this court and that the proposed removal of the Chief Justice, if effectuated, would not constitute a bill of attainder, I respond to the question asked of us in the affirmative.

### Appendix

a. W.R. Staples, *Proceedings of the First General Assembly*, pp. VIII, IX, (1847).

b. J.R. Bartlett, Secretary of State, 1 *Rhode Island Colonial Records* 147 (1st ed. 1856).

c. *Id.* at 191–92.

d. *Id.* at 194–95.

e. *Id.* at 204.

---

**25.** Although no legislative history exists relative to the introduction of the resolution or its revivification, articles in The Providence Journal which appeared around the time of the filing of the request for this advisory opinion reveal no punitive motive on the part of the legislators. The Providence Journal for Wednesday, October 9, 1985, quoted a written statement issued by Democrats Lieutenant Governor Richard Licht, Senate Majority Leader John C. Revens, Jr., House Speaker Matthew J. Smith, and House Majority Leader Joseph DeAngelis to the effect that at stake if the Chief Justice remained on the court was "both the integrity of the judicial process and the career and reputation of Rhode Island's highest judicial official. In order to remove any cloud over the Chief Justice's status and the reputation of Rhode Island's judiciary," the statement continued, "we will ask the Governor to request the Supreme Court to issue an advisory opinion clarifying the General Assembly's authority to act in this matter." The Providence Journal, October 9, 1985, at A–1, col. 5.

**26.** Having found the proposed resolution to lack the requisite specificity and punitive purpose, I need not address the third element of a bill of attainder, the lack of a judicial trial.

f. *Id.* at 205.

g. W.R. Staples, *Proceedings of the First General Assembly* 62 (1847).

h. P.T. Conley, *Democracy in Decline* 21 (1977).

i. Rhode Island Manual (1983–84) 119.

j. *Id.* at 122.

k. *Id.* at 121.

l. Carroll, *History of Rhode Island* 741 (1930).

m. Rhode Island Manual (1983–84) 122–23.

n. Public Laws 1730, 8.

o. *Id.* at 29.

p. *Id.* at 106.

q. *Id.* at 191–92.

r. Public Laws 1745–1752.

s. Public Laws 1798 140–46.

t. P.T. Conley, *Democracy in Decline* 49 (1977).

u. 1 Field, *State of Rhode Island and Providence Plantations -- A History* 355 n. 1.

v. W.G. Goddard, "An Address to the People of Rhode Island Delivered in Newport on Washington, May 3, 1843, in the Presence of the General Assembly on the Occasion of the Change in Civil Government of Rhode Island"

w. P.T. Conley, *Democracy in Decline* 314–15 (1977).

x. *Id.* at 323.

y. *Id.* at 351–372.

January 1, 1935.

I, Edmund W. Flynn, do solemnly swear that I will support the Constitution of the United States and the Constitution and the laws of this state; that I will administer justice without respect to persons, and do equal right to the poor and to the rich; and that I will faithfully and impartially discharge and perform all the duties incumbent on me as chief justice of the supreme court according to the best of my abilities, agreeably to law; so help me God.

Edmund W. Flynn

/s/ Edmund W. Flynn

Subscribed and sworn to before me this first day of January, A.D.1935.

————————————————

Notary Public

The Supreme Court

Providence, January 2, 1935.

To the Honorable Secretary of State of the State of Rhode Island and Providence Plantations.

I, Charles F. Stearns, hereby file with you notice that I have turned over my office as Chief Justice of the supreme Court and the official papers connected therewith to my successor without having in the meantime performed any of the functions of my said office as provided in the joint resolution entitled "Joint Resolution declaring vacant the places of the Chief Justice and Associate Justices of the Supreme Court" passed by the General Assembly and approved by the Governor on the first day of January, A.D., 1935.

Charles F. Stearns