## LAKE COUNTY *v.* ROLLINS.[1]

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 1347. Submitted January 2, 1889. — Decided May 13, 1889.

The constitution of Colorado of 1876 provided that no county should contract any debt by loan in any form except for certain purposes therein named; that such indebtedness contracted in any one year should not exceed the rate therein named; and that "the aggregate amount of indebtedness of any county for all purposes . . . shall not at any time exceed twice the amount above herein limited," etc. *Held*, that this limitation was an absolute limitation upon the power of the county to contract any and all indebtedness, not only for the purposes named in the act, but for every other purpose whatever, including county warrants issued for ordinary county expenses, such as witnesses' and jurors' fees, election costs, charges for board of prisoners, county treasurer's commissions, etc.

THE case, as stated by the court, was as follows:

This action was instituted in the Circuit Court of the United States for the District of Colorado. It is a suit against the county of Lake, in that State, and is based on a large number of county warrants issued for the ordinary county expenses, such as witnesses' and jurors' fees, election costs, charges for the board of prisoners, county treasurer's commissions, etc.

The county has offered several defences; but the view we take of the case renders it unnecessary to notice any save one.

The fifth defence offered is, that of want of authority on the part of the county commissioners to issue the warrants in question or any of them. It is claimed that section six, article eleven, of the state constitution of 1876, fixes a maximum limit, beyond which no county can contract any indebtedness, and that the warrants sued on were all issued after that limit had been reached, and even exceeded; and that they are all, for that reason, void.

---

[1] The docket-title of this case is " *The Board of County Commissioners of the County of Lake v. Frank W. Rollins.*"

The constitutional provision in question is as follows:

"No county shall contract any debt by loan in any form, except for the purpose of erecting necessary public buildings, making or repairing public roads and bridges; and such indebtedness contracted in any one year shall not exceed the rates upon the taxable property in such county following, to wit: counties in which the assessed valuation of taxable property shall exceed five millions of dollars, one dollar and fifty cents on each thousand dollars thereof; counties in which such valuation shall be less than five millions of dollars, three dollars on each thousand dollars thereof; and the aggregate amount of indebtedness of any county, for all purposes, exclusive of debts contracted before the adoption of the constitution, shall not at any time exceed twice the amount above herein limited, unless when, in manner provided by law, the question of increasing such debt shall, at a general election, be submitted to such of the qualified electors of such county as in the year last preceding such election shall have paid a tax upon property assessed to them in such county, and a majority of those voting thereon shall vote in favor of increasing the debt: but the bonds, if any be issued therefor, shall not run less than ten years; and the aggregate amount of debt so contracted shall not at any time exceed twice the rate upon the valuation last herein mentioned: *Provided,* That this section shall not apply to counties having a valuation of less than one million of dollars."

To this defence, the plaintiff below responded to the effect that the provision quoted was not applicable to the warrants in question; that it is properly applicable only to debts created by loan, for the purpose of erecting necessary public buildings or making or repairing public roads and bridges; and that as to debts so created by loan for the purposes designated, and as to them alone, a limitation of amount is fixed, first, as to the sum that may be incurred in any one year, and secondly, as to the aggregate sum that may be incurred by the accumulating debts of more than one year; and that these objects and restrictions exhaust the scope of the provision.

The cause was tried below on an agreed state of facts, before

the court, on the written waiver of a jury. In the agreement is found the following stipulation:

"It is further stipulated and agreed that if section six (6), of article eleven (11), of the constitution of the State of Colorado, be construed to be a limitation upon the power of defendant county to contract any and all indebtedness, including all such as that sued upon in this action, then it is admitted that the claimed indebtedness sued on herein was incurred after the limitation prescribed by said constitution had been reached and exceeded by the said defendant, the county of Lake, and in the event of such a construction by this court, or the Supreme Court of the United States, then and in that case, and for the purposes of this action, it is hereby also admitted that all the allegations of the fifth separate defence to this action of the answer of the defendant are true and correct, and the defendant entitled to judgment thereon."

The court below held, 34 Fed. Rep. 845: First, that the said section six, in all of its sentences, does not refer exclusively to debts contracted by loan, but there are two independent declarations in it, the second declaration beginning with the words, "and the aggregate amount of indebtedness of any county, for all purposes, etc.;" secondly, that in determining whether the limit of county indebtedness, fixed by the second declaration, had been reached, it is immaterial how any particular portion of the indebtedness arose; but that, thirdly, when such limit had been reached, while the power of the county to incur further debt by contract was suspended, the liability for further amounts in the shape of fees and salaries, and other "compulsory obligations" imposed by the will of the legislature, remained and was enforcible. Proceeding on this idea, the Circuit Court rendered judgment in favor of the plaintiff below; whereupon the county brought the case here by writ of error.

*Mr. Daniel E. Parks* and *Mr. H. B. Johnson* for plaintiff in error.

*Mr. Willard Teller* for defendant in error.

Section 6 of article 11 of the constitution of Colorado is a limitation, first, to debts incurred " by loan " ; and, second and further, such debts by loan are limited to debts contracted for two purposes only, viz., erecting public buildings and making and repairing roads and bridges; and, third, the limitation is to debts contracted in any one year; and, fourth, to an aggregate indebtedness for any number of years.

State constitutions are not grants of power but a limitation upon pre-existing power; and to these general propositions we need cite no authority. From this it follows that all bodies recognized by the constitution as having plenary powers in any direction will be limited as to those powers only by express or implied constitutional limitations, and to authorize an *implied* limitation, the implication must be a *necessary* one. *People* v. *Rucker*, 5 Colorado, 455; *People* v. *Wright*, 6 Colorado, 92; *Alexander* v. *People*, 7 Colorado, 155.

In construing this section, courts must construe it to be a limitation of the powers of the legislature and counties, only when the limitation is expressed or implied, since both these bodies are constituent parts of the state government and are especially referred to and recognized in the constitution itself as existing before the constitution. And, since the counties are constituent parts of the state government, necessary to effectuate the political organization and administration of the state government, neither the laws of the State nor its constitution should be interpreted so as to impair, much less to deprive them of power to effectuate the ends of county being. *Hamilton County* v. *Mighels*, 7 Ohio St. 109; *Talbot County* v. *Queen Anne County*, 50 Maryland, 245; *State* v. *St. Louis*, 34 Missouri, 546; *Ray County* v. *Bentley*, 49 Missouri, 236.

It is a settled rule of construction, that in construing such a section, we must presume that no superfluous words were used, and that meaning must be given to every word used; and if possible it must be so construed as to make every word significant of something, so as, if possible, to make every word operative; and, above all, as the section is one of many in one instrument it must be so construed as to be consistent with the objects of the whole instrument and to secure effectiveness to

all parts of it. *United States* v. *Bassett*, 2 Story, 389; *Derr* v. *Dubois*, 16 N. Y. 285; *People* v. *Osborne*, 7 Colorado, 605; *Opinion of Judges*, 22 Pick. 571; *Commonwealth* v. *McCaughy*, 9 Gray, 297. And since the various counties of the State are recognized by the constitution itself as having plenary powers in some directions, such powers can be limited only by express, or implied constitutional restrictions, and to authorize an implied limitation the implication must be a necessary one. *People* v. *Rucker*, 5 Colorado, 455; *People* v. *Wright*, 6 Colorado, 92; *Alexander* v. *People*, 7 Colorado, 155.

Proceeding then to construe, we say: (1) The first three lines are plainly declaratory of the scope and intent of the section, viz., to restrain the contracting of debts by loan, and to restrain that class of debts to the purpose of building roads and bridges and the repair thereof; (2) to limit the amount that could be contracted in any one year; (3) to limit the amount of the aggregate of such debts in any number of years; (4) to provide for a contingency by allowing the people by vote to exceed the first limits named; (5) the words "by loan in any form" are used in the same article in the same way to restrict incurment of debt by loan; (1) sections 3 and 4 as to the State; (2) section 7 as to school districts; (3) section 8 as to towns and cities. These sections, being *in pari materia* with section 6, must all be considered in construing it. It is clear that the restriction in section 3 is confined to debts for four purposes.

But if we interpolate the word "such" before the word "indebtedness," in the tenth line, and after the words "aggregate amount," we shall have precisely the same limitations in the same words as in section 3, and we shall leave unlimited those debts, the incurment of which are had without a loan, but which are essential to county government and county life, and the interpolation of the word is warranted by the rule.

The construction of a statute should always be such as, if possible, not to lead to injustice or absurd consequences, and infringe as little as possible on the existing rights of individuals. Or, as the rule was expressed by this court in *United States* v. *Kirby*, 7 Wall. 486: "All laws should receive a sensi-

ble construction. General terms should be so- limited in their application as not to lead to injustice, oppression or an absurd consequence. It will always be presumed that the legislature included exceptions to its language which would *avoid results of this character.*" *United States* v. *Fisher*, 2 Cranch, 358; *Chinese Merchant Case*, 13 Fed. Rep. 605; *Southern Pacific Railroad* v. *Orton*, 32 Fed. Rep. 457, 477; *Springfield* v. *Edwards*, 84 Illinois, 626.

The construction of this statute contended for by the plaintiff in error leads to many and manifest absurdities, making municipal government impracticable.

The convention, in adopting the language and opinions of this section, were acting, to some extent at least, as other States that have already adopted similar provisions. Prior to 1876 seven States had adopted a similar provision in their constitutions, to wit: Iowa in 1846, Oregon in 1857, Illinois in 1870, Pennsylvania in 1873, West Virginia in 1872, Wisconsin in 1874, Missouri in 1875. The language, in all these States, is plain and more imperative than that of Colorado. Yet in Missouri, the only State in which the question has been raised, it has been held that necessary county expenses are not included in the limitations.

Since then, counties, county officers and the powers of county officers are especially recognized in the constitution, and the salaries and fees are by it to be fixed by legislative enactment, and since by the schedule of the constitution, all laws relating to these officers and persons were left in force, it follows that as to all powers formed *before* the constitution the same was possessed afterwards, except by limitation, and that limitation, like limitation on legislative powers, must be strictly construed. *Southern Pacific Railroad* v. *Orton*, 32 Fed. Rep. 451, and cases cited.

A state constitution, establishing the fundamental law of the State, must be in harmony with itself. If two constructions of any part of it be possible, that construction must be adopted which will not only best harmonize with other sections, but give compensation when compensation is due, and make effective every agency provided in it to make the state gov-

ernment effective. Since the organization of administrative power of counties is recognized, and is necessary to state government, neither any part of the constitution or the statutes should be construed so as to render them less suitable to effectuate their ends. Neither the machinery of elections, the collection of the taxes, or the prosecution of criminals, can be carried on except through the county officers. Hence, not only must the counties be preserved, but provision made for payment of county officers. *People* v. *Wright*, 6 Colorado, 92; *People* v. *Draper*, 15 N. Y. 532; *People* v. *Fancher*, 50 N. Y. 291.

In *Fisk* v. *Jefferson Police Judge*, 116 U. S. 131, this court held that where the law attaches a fixed compensation to a public office, a person filling the office is entitled to the compensation, as by an implied contract which could not be impaired by legislation. So in the case at bar, the power to fix compensation having been expressly conferred on the legislature, and it having been fixed by it in accordance with the constitutional power thus given, the compensation can by no known rules of construction be taken away from such office, since the law and the constitution in all parts must stand together if possible, and the construction is clearly possible, and, as we have seen, imperatively required to effectuate the end of both the constitution and the laws, and county government. And such has been the holdings of the Supreme Court of California in the case of *Welsh* v. *Strothe*, 16 Pac. Rep. 22, where the court held that the salaries of county officers fixed by statute were not included within the terms of a law which provided that the county authorities could not contract for or pay, in any one month, any demand against the treasury exceeding one twelfth that allowed by law to be expended for the fiscal year. So, too, in *Smith* v. *Town of Dedham*, 144 Mass. 177, it was held that a statute which provided that " cities and towns may, by ordinary vote, incur debts for temporary loan in anticipation of the taxes," etc., and by another section provided that " *other debts* than those mentioned in the preceding section shall be incurred only by a vote of two thirds of the voters present and voting at a town

meeting," could not be held to include *all* debts, and could not be held to inhibit contraction of debts necessary and convenient to the exercise of the corporate powers of such towns.

MR. JUSTICE LAMAR, after stating the case as above reported, delivered the opinion of the court.

We are unable to assent either to the conclusions of the court below, or to the positions of defendant in error. The language of the sixth section seems to be neither complicated nor doubtful; and we think it plain that what is meant is exactly what is said; no more and no less. It deals with the subject of county debts; and to begin with, assumes a unit of measurement which is one and one half dollars in the thousand of assessed values; that is, one and one half mills on the dollar. This is about equal to the average amount of taxes levied for county purposes per annum under normal conditions. The provision then proceeds as follows:

*First.* It provides that no county shall borrow money in any way;

*Secondly.* Exception is then made in favor of the erection of necessary public buildings, and the making or repairing of public roads and bridges; and,

*Thirdly.* The loans allowed by the foregoing exception to be taken in any one year are limited to the amount of one and one half mills on assessed values in one class of counties, and three mills in another class.

Here the matter of indebtedness by loan is completed; and the section passes to a broader subject. Manifestly, the purpose of the collocation of the two passages in one section is not that by a wrested reading the latter may yet further limit and complicate the power of borrowing; but that the meaning of the latter passage may be more sharply and clearly defined and emphasized by an antithesis. It is an example not of inadvertence, but of good rhetoric, as if special attention had been by discussion and care given to the wording of the section.

The next provisions are:

*Fourthly.* That the aggregate debt of any country for all purposes (exclusive of debts contracted before the adoption of the constitution) shall not at any time exceed the sum of three mills (or six, as the class might be) on assessed values; unless the taxpayers vote in favor of such excess, at some general election; and

*Fifthly.* That even when an election has been held, the aggregate debt so contracted shall not exceed, at any one time, the sum of six mills (or twelve, as the case might be) on the assessed values.

We are unable to adopt the constructive interpolations ingeniously offered by counsel for defendant in error. Why not assume that the framers of the constitution, and the people who voted it into existence, meant exactly what it says? At the first glance, its reading produces no impression of doubt as to the meaning. It seems all sufficiently plain; and in such case there is a well-settled rule which we must observe. The object of construction, applied to a constitution, is to give effect to the intent of its framers, and of the people in adopting it. This intent is to be found in the instrument itself; and when the text of a constitutional provision is not ambiguous, the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument.

To get at the thought or meaning expressed in a statute, a contract or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the legislature have the right to add to it or take from it. *Newell* v. *People,* 7 N. Y. 9, 97; *Hills* v. *Chicago,* 60 Illinois, 86; *Denn* v. *Reid,* 10 Pet. 524; *Leonard* v. *Wiseman,* 31 Maryland, 201, 204; *People* v. *Potter,* 47 N. Y. 375; Cooley, Const. Lim. 57; Story on Const. § 400; *Beardstown* v. *Virginia,* 76 Illinois, 34. So, also, where a law is expressed in plain and unambiguous terms, whether those terms are general or lim-

ited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. *United States* v. *Fisher*, 2 Cranch, 358, 399; *Doggett* v. *Florida Railroad*, 99 U. S. 72.

There is even stronger reason for adhering to this rule in the case of a constitution than in that of a statute, since the latter is passed by a deliberative body of small numbers, a large proportion of whose members are more or less conversant with the niceties of construction and discrimination and fuller opportunity exists for attention and revision of such a character, while constitutions, although framed by conventions, are yet created by the votes of the entire body of electors in a State, the most of whom are little disposed, even if they were able, to engage in such refinements. The simplest and most obvious interpretation of a constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption.

Such considerations give weight to that line of remark of which *The People* v. *Purdy*, 2 Hill, 31, 36, affords an example. There, Bronson, J., commenting upon the danger of departing from the import and meaning of the language used to express the intent, and hunting after probable meanings not clearly embraced in that language, says: "In this way . . . the constitution is made to mean one thing by one man and something else by another, until in the end it is in danger of being rendered a mere dead letter, and that, too, where the language is so plain and explicit that it is impossible to make it mean more than one thing, unless we lose sight of the instrument itself and roam at large in the boundless fields of speculation."

Words are the common signs that mankind make use of to declare their intention to one another; and when the words of a man express his meaning plainly, distinctly and perfectly, we have no occasion to have recourse to any other means of interpretation.

Defendant in error insists that the interpretation contended for by the county leads to certain absurd consequences, viz., that it is senseless to limit the power of a county to incur

debt generally, since its exercise of such a power may, by sudden exigencies, become imperatively necessary to the discharge of its functions; that it would be to require the county to provide in advance, by taxation or otherwise, for the payment of expenses, which, from their nature, can only be guessed at; that it would be to enable any county in two years, by a vote and a loan, to exhaust the whole possible indebtedness in the way of buildings, roads and bridges, leaving no margin for other necessities; that it would be to destroy the county governments, since the county officials and others will not work for nothing, and the margin of possible debt is, in nearly all the counties, already reached; and that it would be to avoid nearly all the tax payments heretofore made in warrants. All of these objections could well be answered from the facts as disclosed by the bill of exceptions; but it is not necessary.

We cannot say, as a matter of law, that it was absurd for the framers of the constitution for this new State to plan for the establishment of its financial system on a basis that should closely approximate the basis of cash. It was a scheme favored by some of the ablest of the earlier American statesmen. Nor can the fact disclosed in the bill of exceptions, that, after the adoption of the state constitution the county officials, and many of the people, designedly or undesignedly, disregarded the constitutional rule, render the plan absurd. If it was a mistaken scheme, if its operation has proved or shall prove to be more inconvenient than beneficial, the remedy is with the people, not with the courts.

In *Wisconsin Central Railroad* v. *Taylor*, 52 Wisconsin, 37, 58, the court says: "We have been urged with great ability to give the section such construction as to forever prevent unjust discrimination by the legislature; and grave consequences have been assumed as the result of a different construction. On the other hand, we have been urged with equal ability that such a decision would unseat many titles, stop revenue, necessitate an immediate revision of the laws of taxation, and possibly the calling of a constitutional convention. The answer to all this is obvious. It is no part of the duty of the court to make or unmake, but simply to construe this provision of the

constitution. All questions of policy; all questions of restriction and unjust discrimination; all questions of flexibility and adjustability to meet the varied wants and necessities of the people — must be regarded as having been fully considered and conclusively determined by the adoption of the constitution. The oath of all is to support it as it is, and not as it might have been. To do so may, in some cases, lead to individual hardships; but to do otherwise would be most portentous with evil." In *Law* v. *People*, 87 Illinois, 385, 395, the court said: "But should it work hardship to individuals, that by no means warrants the violation of a plain and emphatic provision of the constitution. The liberty of the citizen, and his security in all his rights, in a large degree depend upon the rigid adherence to the provisions of the constitution and the laws, and their faithful performance. If courts, to avoid hardships, may disregard and refuse to enforce their provisions, then the security of the citizen is imperilled. Then the will, it may be the unbridled will, of the judge, would usurp the place of the constitution and the laws, and the violation of one provision is liable to speedily become a precedent for another, perhaps more flagrant, until all constitutional and legal barriers are destroyed, and none are secure in their rights. Nor are we justified in resorting to strained construction or astute interpretation, to avoid the intention of the framers of the constitution, or the statutes adopted under it, even to relieve against individual or local hardships. If unwise or hard in their operation, the power that adopted can repeal or amend, and remove the inconvenience. The power to do so has been wisely withheld from the courts, their functions only being to enforce the laws as they find them enacted."

In the light of these principles, expressed in the authorities quoted and in many others, we must decline to read the expression in section six, "and the aggregate amount of indebtedness of any county, for *all* purposes," etc., as if it were written "and the aggregate amount of *such* indebtedness," etc. This the defendant in error concedes to be necessary to his case. We see no admissible reason for the

introduction of this restrictive word " such," except to alter radically the plain meaning of the sentence.

Neither can we assent to the position of the court below that there is, as to this case, a difference between indebtedness incurred by contracts of the county and that form of debt denominated " compulsory obligations." The compulsion was imposed by the legislature of the State, even if it can be said correctly that the compulsion was to incur debt; and the legislature could no more impose it than the county could voluntarily assume it, as against the disability of a constitutional prohibition.' Nor does the fact that the constitution provided for certain county officers, and authorized the legislature to fix their compensation and that of other officials, affect the question. There is no necessary inability to give both of the provisions their exact and literal fulfilment.

In short, we conclude that article six aforesaid is " a limitation upon the power of the county to contract any and all indebtedness, including all such as that sued upon in this action;" and therefore, under the stipulation already set forth, the county is entitled to judgment.

*Wherefore the judgment of the court below is reversed, and the case is remanded to that court, with a direction to enter judgment for the defendant.*