965 A.2d 1012 (2009)
NEW HAMPSHIRE ASSOCIATION OF COUNTIES and another
v.
STATE of New Hampshire and another.
No. 2008-390.
Supreme Court of New Hampshire.
Argued: November 12, 2008.
Opinion Issued: January 16, 2009.
*1014 Devine, Millimet & Branch, P.A., of Concord (Robert E. Dunn, Jr. on the brief and orally), for the plaintiffs.
Ransmeier & Spellman, P.C., of Concord (Andrew B. Livernois on the brief and orally), for the defendants.
New Hampshire Municipal Association, of Concord (Cordell A. Johnston on the joint brief), as amicus curiae.
New Hampshire School Boards Association, of Concord (Theodore E. Comstock on the joint brief), as amicus curiae.
GALWAY, J.
The plaintiffs, the New Hampshire Association of Counties and Belknap, Carroll, Cheshire, Coos, Grafton, Hillsborough, Merrimack, Rockingham, Strafford and Sullivan Counties, individually, appeal from the Trial Court's (Conboy, J.) order granting summary judgment in favor of the defendants, the State of New Hampshire *1015 and the Commissioner of the New Hampshire Department of Health and Human Services (collectively, the State). We affirm.
The record supports the following. In 1998, the legislature passed what is referred to by the parties as SB 409, which was aimed at reforming the system for delivering and paying for long-term care for the indigent elderly and disabled. See Laws 1998, ch. 388. Prior to the enactment of SB 409, the counties had been responsible for paying for certain portions of Old Age Assistance (OAA) and Aid to the Permanently and Totally Disabled (APTD) for those in nursing homes, as well as for making a Local Medical Assistance Contribution (LMAC) relating to the same people. See RSA 167:18-a,:18-b,:18-f (1994). Under SB 409, in addition to these and other required payments, the counties became liable for paying a share of the cost of medical care for those persons eligible for nursing home care, but who receive care under a Home and Community Based Care (HCBC) waiver. See Laws 1998, 388:8. SB 409 contained a "sunset" provision stating that RSA 167:18-b and RSA 167:18-f, which defined the OAA, APTD and LMAC payments, would be repealed on June 30, 2003. Laws 1998, 388:16, I, II,:17, II. In order for the relevant portions of SB 409 to take effect, SB 409 expressly provided that county approval was required. Laws 1998, 388:10. The counties approved SB 409. Since that time, the State has extended the sunset provision, most recently from 2007 to 2013. See Laws 2007, 263:17,:25,:26. There is no dispute about the State having delayed the sunset from 2003 to 2007.
In 2005, the legislature passed Laws 2005, chapter 177, which increased the amount of the counties' LMAC payments. Laws 2005, 177:13. In 2007, the legislature passed Laws 2007, chapter 263 (chapter 263), which realigned and consolidated the statutory scheme governing the relationship between the counties and the State as regards financial support for the indigent elderly and disabled. See Laws 2007, ch. 263. As a result of the passage of chapter 263, RSA 167:18-b was repealed, but nearly all of its provisions were incorporated into RSA 167:18-a. See RSA 167:18-a (Supp.2008). As to the financial impact of the changes under chapter 263, for fiscal year 2008, little changed between the counties and the State. Laws 2007, 263:17. For fiscal years 2009 through 2013, however, the county share for nursing home and HCBC care for OAA and APTD recipients was raised from fifty to one hundred percent of the share not covered by federal Medicaid payments. Id. For fiscal years 2009 and 2010, chapter 263 contains a "hold harmless" provision ensuring that the counties will not be required to pay more than they paid under the prior statutory funding scheme established by RSA 167:18-b prior to its repeal. Id. For fiscal years 2011 through 2013, there is no "hold harmless" provision, but the statute provides that caps on billings to the counties "shall be established" by the legislature for those years. Id. Chapter 263 also repealed RSA 167:18-f effective July 1, 2008. Laws 2007, 263:24.
In August 2007, the plaintiffs brought suit in superior court seeking an injunction barring the enforcement of some of the above-referenced statutes, and a declaratory judgment that the statutes violated Part I, Article 28-a of the New Hampshire Constitution. The trial court denied the injunction and, on cross-motions for summary judgment, ruled in favor of the State, concluding that the statutes did not violate the constitution. The plaintiffs now appeal, arguing that the extensions of the sunset provision contained in SB 409, the increase in the counties' share of nursing home and HCBC care costs pursuant to *1016 chapter 263, and the 2005 increase in their LMAC obligations, all violate Article 28-a.
"In reviewing the trial court's summary judgment rulings, we consider the evidence in the light most favorable to each party in its capacity as the non-moving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law." N.H. Assoc. of Counties v. Comm'r., N.H. Dep't of Health & Human Servs., 156 N.H. 10, 14, 930 A.2d 400 (2007). The sole issue on appeal is whether the challenged legislative enactments violate Part I, Article 28-a of the New Hampshire Constitution. We review the constitutionality of the statutes de novo. See Baines v. N.H. Senate President, 152 N.H. 124, 133, 876 A.2d 768 (2005).
In reviewing a legislative act, we presume it to be constitutional and will not declare it invalid except upon inescapable grounds. N. Country Envtl. Servs. v. State of N.H., 157 N.H. 15, 18, 943 A.2d 786 (2008). In other words, we will not hold a statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution. Id. When we are required to interpret a provision of the constitution, we view the language used in light of the circumstances surrounding its formulation. N.H. Munic. Trust Workers' Comp. Fund v. Flynn, Comm'r, 133 N.H. 17, 21, 573 A.2d 439 (1990). We give the words in question the meaning they must be presumed to have had to the electorate when the vote was cast. Id.
Adopted in 1984, Article 28-a provides:
The state shall not mandate or assign any new, expanded or modified programs or responsibilities to any political subdivision in such a way as to necessitate additional local expenditures by the political subdivision unless such programs or responsibilities are fully funded by the state or unless such programs or responsibilities are approved for funding by a vote of the local legislative body of the political subdivision.
N.H. CONST. pt. I, art. 28-a. We have stated that this amendment "was designed to provide a safety net to save cities and towns from the burden of coping with new financial responsibilities, not of their own creation, and to permit them a stronger grasp of their fiscal affairs." Flynn, 133 N.H. at 27, 573 A.2d 439. To that end, the amendment "was designed to prohibit the State from placing additional obligations on local government without either obtaining their consent or providing the necessary funding." Id. at 22, 573 A.2d 439; see also Opinion of the Justices (Voting Age in Primaries), 157 N.H. 265, 273, 949 A.2d 670 (2008). The "constitutionality of a particular State mandate under article 28-a does not hinge solely on whether or not it may be categorized as a new, expanded or modified program, but also on whether or not the mandate imposes upon local government an additional fiscal obligation." Flynn, 133 N.H. at 23, 573 A.2d 439. "Increased expenditures alone are not dispositive of whether a program or responsibility has been expanded." Town of Nelson v. N.H. Dep't of Transportation, 146 N.H. 75, 78, 767 A.2d 435 (2001). "The primary consideration is the net effect of the program." Opinion of the Justices (Solid Waste Disposal), 135 N.H. 543, 545, 608 A.2d 870 (1992). In the end, the invocation of this provision "requires both a mandate of responsibility to the political subdivision and a requirement of additional local political subdivision expenditures by virtue of the mandate." Nelson, 146 N.H. at 78, 767 A.2d 435.
In reviewing the net effect of the enactments at issue, we conclude that no new, expanded or modified program or responsibility has been enacted, or, to the extent it has, there is no requirement of additional *1017 local expenditures and thus no violation of Article 28-a. Prior to the adoption of Article 28-a in 1984, the counties were required to pay for fifty percent of the share of providing the relevant programs that was not paid by the federal government through the Medicaid program. See RSA 167:18,:18-a,:18-b (1977). Though the percentages varied at times, see, e.g., RSA 167:18-b (1994), the obligation to pay fifty percent was continued in 1998 with the passage of SB 409, see Laws 1998, 388:8, and again continued through the passage of chapter 263. See Laws 2007, 263:17. Thus, at the dates most significant to the legislation at issue, the net effect has been merely to continue an obligation in existence prior to the adoption of Article 28-a.
The counties contend, however, that Laws 2007, 263:25, which extended the sunset provisions contained in SB 409, violates Article 28-a because it mandated a new obligation for county payments after the obligation was to cease. According to the counties, the sunset provision was intended to end their obligation to pay for these programs in 2007, and thus the extension created a new obligation to make payments beyond 2007. Alternatively, the counties contend that if the payment requirement did not create a new obligation, it is at least an expansion or modification of the prior payment obligation. The State counters that this is a long-standing obligation which is not defined by reference to a particular date. The State also contends there was no intent to end the obligation and that a change in the repeal date does not create a new, or alter the old, obligation.
While the mere existence of a historical obligation does not automatically render the counties liable for continued payments, we note that the counties have had some obligation to pay for these services for more than 200 years. See, e.g., Act of January 22, 1790 reprinted in 5 Laws of New Hampshire 502 (1916). It might, therefore, seem unreasonable to interpret the sunset provision as having been intended to terminate such a long-standing obligation. Nevertheless, the counties contend that with the passage of the sunset provision in SB 409, their obligation was to terminate. We reject this argument for two reasons. First, as a technical matter, SB 409 provided that RSA 167:18-b would be repealed on a particular date, and, in fact, RSA 167:18-b has been repealed. See Laws 2007, 263:24. Thus, the statute's repeal provision has been given effect, and shifting of the obligation to RSA 167:18-a does not somehow undo the sunset.
Second, nothing in the language of SB 409 indicates that the repeal of RSA 167:18-b would end the counties' financial obligation. Essentially, the effect of the sunset provision, if it had not been extended, would have been to reset the amount of the obligation, not eliminate it. The counties contend that "under the law as it stood prior to the enactment of Chapter 263, there was no statute which required the counties to pay these costs." However, RSA 166:1-a (2002), which is unchallenged by the counties, states that the counties will be required to reimburse the State for these services at an amount determined by the legislature. RSA 167:18-b then set the amount and timing of the payments. The repeal of RSA 167:18-b thus would not end the obligation. Because the extension of the repeal date is merely a continuation of an obligation predating the enactment of Article 28-a, chapter 263's extension of the sunset does not violate Article 28-a. See Town of Nelson, 146 N.H. at 79, 767 A.2d 435.
The counties argue that this logic cannot be used to defend the HCBC payments because such payments did not exist until the passage of SB 409 in 1998, and *1018 thus do not predate Article 28-a. HCBC payments, however, are made for those eligible for nursing home care but who do not receive care in an actual nursing home. Laws 1998, 388:8. The counties do not dispute that they have had an existing obligation to pay for those eligible for nursing home care. The HCBC payments are thus little more than a redirection of payments already owed.
The counties also contend that because SB 409 required their approval, after they approved it the State was bound by its repeal language and could not unilaterally alter the obligation. The legislature, however, has authority to amend any statute, consistent with the constitution. The counties' agreement, while a statutory precondition for SB 409 to become fully effective, did not prevent the legislature from later amending the statutes to continue the counties' pre-existing obligation past a time the counties may have believed it would end. In other words, the counties' belief did not dictate State action.
The counties next argue that the State violated Article 28-a when, pursuant to Laws 2007, 263:17, it expanded the counties' payment obligations of OAA, APTD and HCBC from fifty to one hundred percent of the non-federal share through at least 2013. We conclude that Article 28-a has not been violated because even presuming that the change in the county obligation from fifty to one hundred percent of the non-federal share is a new, expanded or modified obligation, we agree with the State that the alteration does not impose a greater cost upon the counties. As stated previously, the "constitutionality of a particular State mandate under article 28-a does not hinge solely on whether or not it may be categorized as a new, expanded or modified program, but also on whether or not the mandate imposes upon local government an additional fiscal obligation." Flynn, 133 N.H. at 23, 573 A.2d 439. Under chapter 263, for fiscal years 2009 and 2010, "no county shall be liable for total billings ... in an amount which would be greater than the amount of liability projected for that fiscal year using the methodology for determining county payments in former RSA 167:18-b prior to its repeal." Laws 2007, 263:17. Thus, regardless of the obligation, for those fiscal years there is no additional fiscal requirement upon the counties and no violation of Article 28-a. Indeed, the counties appear to concede as much.
As regards fiscal years 2011 through 2013, the remaining operative years of chapter 263, the law states that caps on total billings shall be established by the legislature. Laws 2007, 263:17. Thus, we assume that pursuant to chapter 263, the legislature intends to establish caps on county spending, at a later date. We agree with the trial court that in light of this provision, the fiscal obligation of the counties in 2011 through 2013 is speculative. Because there must be a clear and substantial conflict with the constitution to declare a legislative act unconstitutional, N. Country Envtl. Servs., 157 N.H. at 18, 943 A.2d 786 we cannot say at this time that chapter 263 violates Article 28-a.
The counties argue that, "The State provided no evidence below to dispute the county affidavits which said that, as Chapter 263 stands, the new law will cost the counties more money in [fiscal years] 2011-2013 than would have been the case had Chapter 263 not been enacted." Therefore, they argue the trial court "should have effectuated the purpose of the declaratory judgment statute and afforded the parties relief from uncertainty and insecurity created by doubt as to rights, status or legal relations."
Although the affidavits submitted by the counties state that the costs of the items for which the counties must pay will increase, *1019 they do not account for the caps called for by the statute which may eliminate any potential constitutional violation. Until it is known whether there will, in fact, be an increase in required county spending, a judgment as to the statute's constitutionality is unwarranted. While the declaratory judgment statute, RSA 491:22 (1997), is meant to relieve parties of uncertainty about their rights, see Werme's Case, 150 N.H. 351, 353, 839 A.2d 1 (2003), we conclude that the uncertainty surrounding potential cost increases does not create a clear and substantial conflict with the constitution. Accordingly, the issue is not ripe for review.
Lastly, the counties contend that Laws 2005, chapter 177, which increased the counties' obligations under the LMAC, violates Article 28-a. We conclude that the issue is moot. The LMAC was required by RSA 167:18-f, which was repealed effective July 1, 2008. See Laws 2007, 263:24. It does not appear to have been reenacted in any other form. Generally a matter is moot when it no longer presents a justiciable controversy because issues involved have become academic or dead. Londonderry Sch. Dist. v. State, 157 N.H. 734, 736, 958 A.2d 930 (2008). A challenge seeking only prospective or declaratory relief is generally mooted where intervening legislative activity renders the prior law inapplicable. Id. Because the law challenged by the counties has been repealed and not reenacted elsewhere, and because the counties sought only declaratory relief relative to that law, we conclude that this issue is moot.
Affirmed.
BRODERICK, C.J., and DALIANIS and HICKS, JJ., concurred; DUGGAN, J., concurred specially in part and dissented in part.
DUGGAN, J., concurring specially in part and dissenting in part.
I agree with the majority that the increase in the county share for nursing home and HCBC care for OAA and APTD recipients does not violate Article 28-a. I also agree with the majority that the issue as to the 2005 increase in LMAC payments is moot. I write separately, however, because I would have reached this conclusion applying a different analysis. I also write separately because I disagree with the majority's conclusion that the sunset provision does not violate Article 28-a.
Part I, Article 28-a, adopted in 1984, provides:
The state shall not mandate or assign any new, expanded or modified programs or responsibilities to any political subdivision in such a way as to necessitate additional local expenditures by the political subdivision unless such programs or responsibilities are fully funded by the state or unless such programs or responsibilities are approved for funding by a vote of the local legislative body of the political subdivision.
"When our inquiry requires us to interpret a provision of the constitution, we view the language used in light of the circumstances surrounding its formulation." N.H. Munic. Trust Workers' Comp. Fund v. Flynn, Comm'r, 133 N.H. 17, 21, 573 A.2d 439 (1990). "We will look to its purpose and intent, bearing in mind that we will give the words in question the meaning they must be presumed to have had to the electorate when the vote was cast." Id. (quotation omitted). "The object of construction, applied to a constitution, is to give effect to the intent of its framers, and of the people in adopting it. This intent is to be found in the instrument itself...." Lake County v. Rollins, 130 U.S. 662, 670, 9 S.Ct. 651, 32 L.Ed. 1060 (1889). "To get at the thought or meaning *1020 expressed in ... a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them." Id. When the words convey a definite meaning, we will not add language to the instrument. Flynn, 133 N.H. at 21, 573 A.2d 439. The United States Supreme Court explained the reasoning for this in Lake County:
[W]here a law is expressed in plain and unambiguous terms, whether those terms are general or limited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. There is even stronger reason for adhering to this rule in the case of a constitution than in that of a statute, since the latter is passed by a deliberative body of small numbers, a large proportion of whose members are more or less conversant with the niceties of construction and discrimination, and fuller opportunity exists for attention and revision of such a character, while constitutions, although framed by conventions, are yet created by the votes of the entire body of electors in a state, the most of whom are little disposed, even if they were able, to engage in such refinements.
Lake County, 130 U.S. at 670-71, 9 S.Ct. 651 (citations omitted).
Based upon our prior cases interpreting Article 28-a, any violation of this constitutional provision requires both (1) a new, expanded or modified program or responsibility, and (2) increased expenditures by the local political subdivision. Town of Nelson v. N.H. Dep't of Transportation, 146 N.H. 75, 78, 767 A.2d 435 (2001); Flynn, 133 N.H. at 22, 573 A.2d 439.
In Flynn, we interpreted the first part of this test. Flynn, 133 N.H. at 22, 573 A.2d 439. At issue in Flynn was a statutory provision, RSA 281-A: 17, II (Supp. 1989), that created a prima facie presumption in workers' compensation cases that a fire fighter suffering from cancer incurred the disease while employed. Flynn, 133 N.H. at 23, 573 A.2d 439. The presumption was a modification of the workers' compensation scheme enacted in 1947. Id. at 19, 573 A.2d 439. The trial court ruled that the presumption violated Article 28-a. On appeal, the department of labor argued that RSA 281-A: 17, II "does not mandate or assign a new, expanded or modified program or responsibility ... because it merely requires a procedural change in establishing eligibility for benefits under pre-existing workers' compensation laws." Id. at 20-21, 573 A.2d 439. We rejected this argument and held that the new presumption violated Article 28-a by imposing a new fiscal obligation on local government. Id. at 24, 573 A.2d 439. Relying upon the reasoning of Lake County, we stated: "A plain reading of the language contained within article 28-a fails to disclose any indication that the amendment was designed to exclude all regulatory acts conducted under pre-existing authority." Id. at 25, 573 A.2d 439.
In our analysis of Article 28-a, we focused on the term "responsibility" because this term "is susceptible to a more expansive reading than the term `program.'" Id. at 22, 573 A.2d 439. We looked to the Journal of the Constitutional Convention in support of our conclusion that, based upon the definition of "responsibility," "the amendment was designed to prohibit the State from placing additional obligations on local government without either obtaining their consent or providing the necessary funding." Id. (emphasis added). We quoted Delegate Pepino: "If [Article 28-a] were adopted, this would prevent the State Legislature from mandating new programs, services, or expenses to local cities and towns without also providing the necessary funding...." Id. (emphasis in original). *1021 We stated, "[I]t is logical that the delegates understood the term `responsibility' to act as a sweeping prohibition against all State mandates that, for one reason or another, may not be categorized as a program." Id. at 23, 573 A.2d 439 (emphasis added). Thus, we held that "the constitutionality of a particular State mandate under article 28-a does not hinge solely on whether or not it may be categorized as a new, expanded or modified program, but also on whether or not the mandate imposes upon local government an additional fiscal obligation." Id.
Based upon our holding in Flynn, the language "any new, expanded or modified program or responsibility" in Article 28-a includes all additional obligations on local government. Article 28-a is a broad and "sweeping prohibition." Flynn, 133 N.H. at 23, 573 A.2d 439. Indeed, our analysis in Flynn addressed only a "new" responsibility on the local government created by a prima facie burden in a statute. Flynn did not address the scope of a "modified" or "expanded" responsibility. Thus, the "sweeping prohibition" created by the term "responsibility" within Article 28-a is even broader in scope than we addressed in Flynn, and includes not only new responsibilities but also modified and expanded responsibilities. Thus, Article 28-a, by its plain language, prohibits creating any additional obligations to already existing responsibilities.
As to the second part of the test, the mandate must require increased expenditures by the local governing body. "Invoking this constitutional prohibition requires both a mandate of responsibility to the political subdivision and a requirement of additional local political subdivision expenditures by virtue of the mandate." Town of Nelson, 146 N.H. at 78, 767 A.2d 435 (quotation omitted).
Article 28-a provides for two express exceptions: (1) "programs or responsibilities [that] are fully funded by the state"; and (2) those programs or responsibilities that are "approved for funding by a vote of the local legislative body of the political subdivision." Our case law provides for a third exception where the program or responsibility is a pre-existing obligation.
Pre-existing obligations are those the local governments funded prior to adoption of Article 28-a, and are therefore required to continue funding. Our sparse case law since Flynn has developed the pre-existing obligation exception. The facts of those cases, however, differ from the facts currently before us.
In Nashua School District v. State, 140 N.H. 457, 667 A.2d 1036 (1995), we determined that, where the local government was responsible for an entire program prior to enactment of Article 28-a, it was a pre-existing obligation. The case concerned the pre-existing obligation on local districts for special education costs. Nashua School Dist., 140 N.H. at 458, 667 A.2d 1036. At issue was a 1985 amendment to RSA 193:27, I, which defined the term "home for children" to include "any residential school." Id. at 459, 667 A.2d 1036. A "residential school" is a private school. Id. When a child is placed in a "home for children," the sending district (where the child resides) reimburses the receiving district (the school district where the child is placed). Id. The amendment "ha[d] the effect of making the sending district liable for all special education costs of a child placed in a `residential school.'" Id. at 460, 667 A.2d 1036. We noted that the State did not assume any part of the cost of a court-ordered placement in a residential school until 1986 and affirmed the trial court's conclusion that the 1985 amendment did not violate Article 28-a because it was not a new, expanded, or modified program or responsibility. Id. at 461, 667 A.2d 1036. As we later explained *1022 in Nelson: "Article 28-a does not preclude municipalities from reassuming financial responsibility for services for which they had been liable prior to its adoption in 1984." Nelson, 146 N.H. at 78-79, 767 A.2d 435.
At issue in Nelson was the State's reclassification of a road from a state highway to a local highway. Id. at 78, 767 A.2d 435. After the reclassification, the town was required to maintain the road. Id. at 76, 767 A.2d 435. The town argued that Flynn controlled. Id. at 79, 767 A.2d 435. We disagreed and held that the reclassification "does not violate Article 28-a because it is not a new or expanded responsibility or program." Id. at 78-79, 767 A.2d 435. "That the contested segments now serve only local traffic may be a new development; the town's responsibility for maintaining roads that serve only local traffic is not new." Id. at 79, 767 A.2d 435. "Adoption of the town's position would essentially limit the roads that a municipality must maintain and require the State to maintain reclassified local roads or any newly constructed roadways." Id. at 79-80, 767 A.2d 435.
In Nelson, the State reclassified a road based upon use. Id. (State "simply decided that a road which now serves only local traffic will no longer be part of the State-maintained highway system."). The town, in turn, could change the use of the local road. Id. ("Similar review is authorized at the local level, where a town may review the need for a road and decide either to discontinue it or limit its maintenance."). The town's responsibilities did not change. Prior to the reclassification, the town was responsible for maintaining local roads, and after the reclassification, the town had the same responsibility. Thus, the reclassification did not create an unfunded mandate.
Similar to Nelson, in Opinion of the Justices (Voting Age in Primaries), 157 N.H. 265, 949 A.2d 670 (2008), we looked at municipal responsibility to determine whether there had been a change. At issue was whether allowing certain seventeen-year-olds to register and vote in primary elections would violate Article 28-a. Id. at 266, 949 A.2d 670. We looked at the local responsibilities associated with voting and voter registration and determined that "municipal responsibility for processing all voter registrations is not new." Id. at 275, 949 A.2d 670. Expanding the voting age group would not expand the municipal responsibility; local officials would participate in the same procedure whether or not seventeen-year-olds were permitted to vote. Id.
In the present case, unlike Nashua School District, the State assumed part of the cost of the programs and responsibilities at issue prior to the adoption of Article 28-a, and thus may not now delegate those responsibilities to the local government in violation of Article 28-a. Moreover, unlike Nelson and Opinion of the Justices (Voting Age in Primaries), the counties' responsibilities have changed. With the 2005 and 2007 legislation, the counties are responsible for increased contributions to OAA, APTD and LMAC for an extended period of time. Moreover, unlike Nelson and Opinion of the Justices (Voting Age in Primaries), where the State action influenced local road maintenance and voting registration, here, the legislation directly implicates local financial contributions. Requiring local governments to assume greater financial responsibility is precisely what Article 28-a aims to prevent.
The issue thus becomes whether the three provisions that are the subject of this appeal violate Article 28-a. Those provisions are: chapter 263 extending the sunset provision to 2013; chapter 263 increasing the counties' contribution to nursing home and HCBC care costs from fifty *1023 percent to 100 percent of the non-federal portion; and the 2005 legislation increasing the county LMAC payments to $27 per month for each OAA recipient and $52 per month for each APTD recipient.
With respect to the counties' argument concerning the 2005 legislation increasing the LMAC payments, the legislature repealed RSA 167:18-f, LMAC payments, effective July 1, 2008. See Laws 2007, 263:24. I therefore agree with the majority that, as to the declaratory relief sought, this issue is moot. The analysis that follows pertains to the remaining two provisions from the 2007 legislation.
The first determination is whether these provisions result in any additional obligations on the counties; to wit, whether they are "new, expanded or modified programs or responsibilities." Prior to 1937, the counties were responsible for providing care to the indigent elderly and disabled. In 1937, the State, through the Department of Public Welfare, began assisting the indigent and disabled. Laws 1937, ch. 202. In 1984, when Article 28-a was adopted, the counties were responsible for contributing fifty percent of the non-federal portion of OAA and APTD, see RSA 167:18-a, and LMAC payments of $6 per month for each OAA recipient and $23 per month for each APTD recipient, see RSA 167:18-f. In 1998, the program was modified to include reimbursement for HCBC. See RSA 167:18-b. As a result, the new legislation required the counties' approval by vote. Laws 1998, 388:10; see N.H. CONST. pt. I, art. 28-a ("unless such programs or responsibilities are approved for funding by a vote of the local legislative body of the political subdivision"). Thus, the counties have certain pre-existing responsibilities regarding OAA, APTD and LMAC.
The counties do not dispute the responsibilities that existed prior to adoption of Article 28-a. Instead, they dispute the validity of certain changes. Specifically, in 2007, the State extended the sunset provision, which would have repealed RSA 167:18-b (reimbursement for nursing and HCBC costs) and RSA 167:18-f (LMAC payments). The State also increased the counties' reimbursement obligations for nursing home and HCBC recipients from fifty percent to 100 percent. Based upon the plain language in Article 28-a, these are "modified ... responsibilities." See Webster's Third New International Dictionary 1452 (unabridged ed.2002) ("modified" includes making "minor changes in the form or structure of"). Article 28-a is a "sweeping prohibition" against any additional obligations on the counties, see Flynn, 133 N.H. at 23, 573 A.2d 439, and the extension of the sunset provision and the increase in the percentage of the county share are additional obligations on the counties.
The analysis does not end here. The next step is to determine whether these additional obligations result in increased expenditures. As to the sunset provision, the counties argue that RSA 167:18-b and RSA 167:18-f were set to expire as of June 30, 2007, and the county funding obligation with respect to the State's nursing and HCBC costs and the LMAC "would have disappeared entirely." Even if RSA 167:18-b and RSA 167:18-f were repealed, the counties would still be liable to reimburse the State for fifty percent of the payments made for OAA and APTD recipients under RSA 167:18-a. The counties would not, however, have been responsible for nursing home or HCBC reimbursement, see RSA 167:18-b, or LMAC payments, see RSA 167:18-f. Extending the repeal provision resulted in the counties incurring an additional expense of contributing to LMAC, nursing home and HCBC care. Reimbursement for nursing home services and LMAC, however, were preexisting obligations; thus, continuing the *1024 programs did not result in Article 28-a violations. HCBC, unlike nursing home care and LMAC, was a new obligation added in 1998, and as a result, required the counties' approval. The counties voted to approve this new obligation, which was included within the same statutory scheme that called for its repeal by a certain date. The State's decision to extend the sunset provision results in the counties contributing to HCBC beyond the time agreed to by the counties. This creates an increased expenditure on the counties that was not a pre-existing obligation and therefore violates Article 28-a.
As to the provision increasing the counties' share for nursing home and HCBC care for OAA and APTD recipients, I agree with the majority that this change did not result in an increased expenditure to the counties. In 2007, with chapter 263, the State substantially restructured the indigent elderly and disabled reimbursement scheme with the bulk of the changes to occur after fiscal year 2008. Chapter 263 includes a provision requiring the counties to reimburse the State for 100 percent of the non-federal share of nursing home and HCBC indigent elderly care. Laws 2007, 263:17. Chapter 263, however, also includes a number of reductions in county obligations as well as an increase in credit from $2,000,000 to $5,000,000 per fiscal year. Chapter 263 also sets caps preventing any billing to exceed set amounts. Moreover, the statute contains a provision that provides "no county shall be liable for total billings in fiscal year 2009 or fiscal year 2010 in an amount which would be greater than the amount of liability projected for that fiscal year using the methodology for determining county payments in former RSA 167:18-b prior to its repeal." Laws 2007, 263:17. Thus, as to fiscal years 2009-2010, there is no Article 28-a violation. Any increase in expense to the counties as a result of the percentage contribution increase is offset by reductions in obligations and increased credit. I agree with the majority that the "net effect" of the changes does not result in an increase in the counties' expenditure. See Opinion of the Justices (Solid Waste Disposal), 135 N.H. 543, 545, 608 A.2d 870 (1992) ("The primary consideration is the net effect of the program.").
Chapter 263 addresses fiscal years 2009-2013. It provides specific provisions for fiscal years 2009-2010, but leaves fiscal years 2011-2013 subject to further legislation and determination. As a result, any analysis as to whether or not the counties will face increased expenses with the changes in fiscal years 2011-2013 is purely speculative. "[W]e will not hold a statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution." N. Country Envtl. Servs. v. State of N.H., 157 N.H. 15, 18, 943 A.2d 786 (2008) (quotation omitted). Thus, I agree with the majority that the counties' claim as to this portion of chapter 263 is not yet ripe for review.
For the reasons stated, I concur specially in part, and respectfully dissent in part.